948 P.2d 1036

STATE of Hawai'i, Plaintiff–Appellee,

v.

Samson K. KAUHI, Defendant–Appellant.

No. 19891.

Supreme Court of Hawai'i.

Nov. 25, 1997.

Reconsideration Denied Dec. 15, 1997.

Clifford B. Hunt, on the briefs, Honolulu, for defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

On September 18, 1995, following a first circuit jury trial, Samson K. Kauhi was convicted of murder in the second degree and burglary in the first degree. On appeal, Kauhi contends that the circuit court committed reversible error by: (1) denying his motion to suppress statements that were given (a) while Kauhi was unlawfully seized, and (b) without adequate *Miranda* warnings; (2) refusing to dismiss for cause a juror who was currently employed as a deputy prosecuting attorney; and (3) limiting Kauhi's cross-examination of one of the witnesses against him.

Because we hold that the circuit court erred in refusing to dismiss for cause a juror who was currently employed as a deputy prosecuting attorney, we vacate Kauhi's convictions and remand this matter for a new trial.

## I. *BACKGROUND*

At approximately 4:00 p.m. on November 14, 1994, Ms. Karin Wong arrived at the Rycroft Street residence of her son's babysitter, Mrs. Ellen M. Lum.[1] Ms. Wong proceeded into the home to pick up her child and found Mrs. Lum dead on the living room floor and the home ransacked. Fortunately, the Wong child was unharmed. Ms. Wong called the police. Subsequently, Detective Harold Fitchett was assigned to lead the investigation of Mrs. Lum's homicide. The investigation led to the eventual arrest of Harry Kauhi, Jr., Leann P. Abraham, and

Samson K. Kauhi. Harry Kauhi pled guilty to burglary in the first degree. Leann P. Abraham agreed to testify against Samson K. Kauhi (Kauhi) in return for a guilty plea to first degree burglary conditioned upon permission to file a motion for a deferred acceptance of guilty plea (DAG Plea).

Prior to trial, Kauhi filed a motion to suppress statements he had made to police on November 17, 1994, the details of which are discussed *infra*, which was denied. At trial, the jury found Kauhi guilty of murder in the second degree and burglary in the first degree, and Kauhi timely appealed.

## II. *STANDARDS OF REVIEW*

We review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was "right" or "wrong." *State v. Navas*, 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996). The admission of evidence of bias or motive under the Hawai'i Rules of Evidence (HRE) Rule 609.1 is also reviewed under the right/wrong standard. *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996). However, "[t]he scope of cross-examination is generally within the sound discretion of the trial court." *Id.*

We review the trial court's decision to pass a juror for cause under the abuse of discretion standard. *State v. Baron*, 80 Hawai'i 107, 114, 905 P.2d 613, 620.(1995).

"The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Ganal*, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (citations omitted).

## III. *DISCUSSION*

### A. *Jury Selection*

During the jury selection process, Kauhi challenged for cause prospective juror Michael Makibe because Makibe was currently employed as a deputy prosecuting attorney with the City and County of Honolulu, the

---

1. The victim in this case is referred to as Mrs. "Lum" in the prosecutor's brief and as Mrs. "Lam" in Kauhi's pleadings.

same office employing the prosecutor trying Kauhi's case. The trial court denied Kauhi's challenge for cause, finding that Makibe's responses during *voir dire* demonstrated Makibe's ability to be impartial. Kauhi used his last peremptory challenge to excuse Makibe. Subsequently, Kauhi requested two additional peremptory challenges and identified the jurors against whom he would utilize those challenges. The court denied his request, and the case proceeded to trial.

■ At the outset, we recognize that any suspicions regarding Makibe's impartiality and the effects, if any, that his current employment status as a prosecutor may have had on the jury are negated by the fact that Makibe did not ultimately serve on the jury, having been excused via Kauhi's last peremptory challenge. However, because the right to exercise a peremptory challenge "is one of the most important of the rights secured to the accused in a criminal case," *State v. Carvalho*, 79 Hawai'i 165, 172, 880 P.2d 217, 224 (App.1994) (citation and internal brackets omitted), "the denial or impairment of [that] right ... is reversible error not requiring a showing of prejudice." *Id.* at 174, 880 P.2d 217, 880 P.2d at 226. Therefore, notwithstanding the fact that Makibe did not ultimately serve as a juror, we examine whether he was improperly passed for cause and, if so, whether Kauhi's right to exercise a peremptory challenge was denied or impaired.

In Hawai'i, whether a juror should be dismissed for cause is a determination that rests with the discretion of the trial judge. HRS § 612–7 (1993) provides:

A juror shall not be excused by a court for slight or trivial cause, but only when it appears that jury duty would entail a serious personal hardship, or that for other good cause the juror should be excused either temporarily or otherwise.

Unlike many of our sister jurisdictions, Hawai'i is a permissive jurisdiction with respect to attorneys sitting for jury duty. An attorney is neither prohibited from nor compelled to perform jury service. *See* HRS § 612–6(b)(1)(1993) ("A person may claim exemption from service as a juror if the person is ... [a]n attorney at law[.]").

■ Many other jurisdictions, however, have adopted legislation that *per se* disqualifies certain persons from jury service. In jurisdictions such as ours, where no such legislation exists, the question whether a prospective juror may serve is left to a case-by-case judicial determination.

Where the Legislature, without violating some guaranteed right of the citizen, has assumed to declare who shall be a competent juror with reference to some particular objection which might otherwise be urged against him, the declaration of the Legislature shall be binding upon the courts, but in the absence of any legislative declaration on the subject, the competency of each particular person called as a juror becomes a question for judicial decision.

*Harrison v. State*, 231 Ind. 147, 106 N.E.2d, 912, 919 (1952) (citation omitted).

Kauhi argues that "a prospective juror employed by the same employer as a lawyer representing a party creates an appearance of impropriety[, and, therefore,] the trial court should excuse the juror upon a challenge for cause as a matter of law." Kauhi reasons that the appearance of impropriety is so manifest under the facts of this case that the court, rather than making an inquiry into Makibe's actual bias, should have simply implied bias and disqualified him.

The prosecution, on the other hand, maintains that, notwithstanding Makibe's employment status, the trial court properly qualified Makibe to sit as a juror because there was no showing of actual bias. It is undisputed that the answers given by Makibe demonstrated his ability to be impartial. Clearly, under the "actual bias test," which the prosecution urges us to apply in all cases, Makibe was properly passed for cause. We therefore examine Kauhi's contention that, under the "appearance of impropriety test," Makibe should have been disqualified as a prospective juror as a matter of law.

In *Beam v. State*, 260 Ga. 784, 400 S.E.2d 327, 328 (1991), the Supreme Court of Georgia had occasion to address the appearance of impropriety doctrine in the case of a juror employed by the district attorney's office. Therein, the court held that it was reversible error to permit a full-time employee of the prosecuting agency's office to serve as a juror because,

[e]ven if the juror in this case was actually unbiased, her service as a juror while she was an employee of the same district attorney who prosecuted the appellant created a substantial appearance of impropriety. The trial court should have stricken the juror to preserve public respect for the integrity of the judicial process. Our reversal of the conviction is necessary to ensure that such public respect is not eroded in future cases.

■ Similarly, we see no reason why we should not apply the appearance of impropriety standard in a case such as the one before us where a prosecutor, currently in the employ of the same office of the very prosecutor who is trying the defendant, is called for jury service. We are not bound by a prospective juror's statement that he or she will be fair and impartial. *See, e.g., State v. Lewis*, 391 So.2d 1156, 1158 (La.1980). "If the revealed details of the relationship are such that bias or prejudice may be reasonably implied, a juror may be properly refused for cause." *Id.* (citation omitted); *see also State v. Pokini*, 55 Haw. 640, 644, 526 P.2d 94, 101 (1974).

Many of our sister states [2] prohibit those who stand in the position of master-servant with the prosecuting agency from serving as jurors. On the facts of the instant case, we are in accord with the essential policy reason behind the prohibition, that is, that "[j]urors should be above suspicion." *Beam*, 400 S.E.2d at 328 (citations omitted). The *Beam* court reasoned that, when the prospective juror is in the same employ as that of the prosecutor, one cannot ignore the suspicions that arise based on the closeness of the relationship. *Id.* We agree that reasonable persons might question an employee's bias in favor of his or her employer, notwithstanding his or her outward declarations of impartiality. An employee may, even unconsciously, make decisions based upon loyalty to the employer or even perhaps out of fear of retribution.

Unlike *Beam*, in the instant case, the employer-employee relationship is further complicated by the nature of a prosecutor's employment. We believe that prosecutors are so closely "identified with criminal procedures that questions regarding possible bias, fairness, prejudice or impermissible influence upon jury deliberations inevitably arise." *Id.* For example, questions of bias or fairness may have arisen due to Makibe's perceived access to documents and other information regarding the case, including access to the prosecutor himself or herself. This combined with the fact that Makibe himself was a prosecutor at the time of the trial would only serve to enhance the appearance of impropriety.

In *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring) (Marshall, Brennan, and Stevens, JJ., dissenting), the United States Supreme Court considered allegations of juror bias under different factual circumstances. A juror in *Smith* submitted an application for employment as an investigator in the District Attorney's Office during the course of the criminal jury trial. The prosecuting attorneys trying the case learned of the submission after the trial commenced, but before its completion. They chose not to disclose their knowledge to the court or defense counsel, concluding that, in light of the juror's statements during *voir dire*, disclosure was not necessary. A few weeks after the jury returned its verdict, the District Attorney informed the court and defense counsel of the possible juror conflict. A post-trial hearing was conducted and, although failure to disclose the juror's employment application was found to be an indiscretion, the court held that it in no way reflected a premature conclusion of guilt or prejudice, or an inability to render a decision based solely on the evidence.

The *Smith* Court, by a 6–3 majority, held that, under the circumstances, the defendant was not denied due process of law. *Id.* at 215, 102 S.Ct. at 944. The majority approved of conducting a hearing, in which the defendant has the opportunity to prove actual bias, to cure allegations of juror partiality. *Id.*

---

**2.** *See, e.g.,* Idaho Code § 19–2020 (1997); Minn. R.Crim. P. 26.02(5); N.Y.Crim. Proc. Law § 270.20(1) (McKinney 1993); N.D. Cent.Code § 29–17–36 (1991); Okla. Stat. tit. 22 § 660 (West 1992); Or.Rev.Stat. § 136.220 (1995); S.D. Codified. Laws Ann. § 23A–20–13 (1988).

Although factually distinguishable from the case before us, the concurring opinion in *Smith,* written by Justice O'Connor, and the dissenting opinion, written by Justice Marshall, are particularly enlightening. In her concurrence, Justice O'Connor wrote:

> I concur in the Court's opinion, but write separately to express my view that *the opinion does not foreclose the use of 'implied bias' in appropriate circumstances.*
>
> . . . .
>
> Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it. . . . [I]n certain instances a hearing may be inadequate for uncovering a juror's biases. . . . While each case must turn on its own facts, *there are some extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency,* that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.

*Id.* at 221–22, 102 S.Ct. at 948 (emphases added).

The dissenting justices expressed concerns regarding the difficulty of proving actual bias and the possibility of unconscious bias on the part of a juror. *Id.* at 228–229, 102 S.Ct. at 951–952. The dissent proposed that, "in cases like this one, where the probability of bias is very high, and where the evidence adduced at a hearing can offer little assurance that prejudice does not exist, the juror should be deemed biased as a matter of law." *Id.* at 231, 102 S.Ct. at 953.

We are in accord with the foregoing reasoning as applied to the specific factual circumstances of this case and hold that, where a prospective juror is a prosecutor currently employed by the same office as the prosecutor trying the defendant, the court shall imply bias as a matter of law and dismiss the prospective juror for cause. We therefore conclude that, in failing to excuse Makibe for cause, the trial court caused Kauhi to exercise his last peremptory challenge to excuse Makibe, thereby foreclosing him from peremptorily challenging at least one of two additional prospective jurors he had wanted to excuse. Under these circumstances, we believe that Kauhi's right to exercise his peremptory challenge was "denied or impaired." *Carvalho,* 79 Hawai'i at 174, 880 P.2d at 226; *cf. Ross v. Oklahoma,* 487 U.S. 81, 82, 108 S.Ct. 2273, 2275, 101 L.Ed.2d 80 (1988) (holding that denial or impairment of right to exercise peremptory challenge not reversible error where Oklahoma state law has long qualified grant of peremptory challenges with requirement that defendant must use those challenges to cure erroneous refusals to excuse jurors for cause). We therefore vacate Kauhi's convictions and remand this case to the circuit court for a new trial.

In light of our decision, we address the remaining issues on appeal, inasmuch as they will undoubtedly resurface on remand.

### B. *Motion to Suppress*

As previously stated, Kauhi filed a motion to suppress statements he made to police on November 17, 1994, which was denied. The following describes the events leading up to Kauhi's questioning by police.

On November 15, 1994, Sumi Uehara, Mrs. Lum's neighbor, provided Detective Fitchett and Detective Michael Tsuda with a description of a suspicious male and female she had observed walking together near the rear of Mrs. Lum's residence on the morning of the murder. She described the male as Hawaiian, in his early twenties, five-feet-five-inches tall, slim build, approximately 160 pounds, brown complexion, and black curly hair.

James Aiu, a security guard working at a school near Mrs. Lum's residence, also gave Detective Fitchett and Detective Tsuda a description of a suspicious male and female whom he had seen near Mrs. Lum's residence around the time of the murder. Aiu observed the male and female being picked up by another male in a red Chevy pick-up truck. Aiu recognized the first male as a robbery convict that he had spent three to five months with in prison sometime between 1979 and 1983. Aiu described the male as Hawaiian Filipino, in his early thirties, five-feet-eleven-inches tall, approximately 130 to 140 pounds, fair complexioned, dark clean-cut

short hair, a mustache, and wearing sunglasses. Aiu also said that the male was now thinner and had grown a mustache since he had been in prison. During their prison time together, Aiu had observed several tattoos on the male's body.

Based upon Aiu's and Uehara's descriptions, police prepared composite drawings of the persons. The following information regarding the male was collated in anticipation of dissemination to the media:

Part Hawaiian male between the ages of 20 and 30, five feet eight to five feet eleven, 135 to 145 pounds, a slim build, short dark hair, mustache and fair to tan complexion.

Various news channels broadcast descriptions of the suspects and of the red pick-up truck. On the evening of November 16, the police received an anonymous phone call informing them that a male and a female named "Kimo" and "Rachel," respectively, and a red chevy pick-up could be located at 45–578 Paleka Road. Detective Fitchett faxed copies of the composites to Officer Thomas Carreiro and instructed him to investigate the address.

The following morning, November 17, 1994, Officer Carreiro, Officer Terrance Kumaewa, and an unidentified third officer, proceeded in an unmarked rental van to 45–578 Paleka Road, but were unable to locate such an address. However, while passing 45–582 Paleka Road, the officers spotted a red GMC pick-up that fit the description. The officers stopped at the address, but only Officer Carreiro got out and knocked on the front door. The other two officers remained within earshot, but did not approach the front door. Two females, both of whom Officer Carreiro recognized from previous cases, answered the door. After informing the female whom he recognized as Rachel that he was looking for "Kimo," Kauhi appeared at the door without a shirt. Carreiro observed that he was covered with tattoos and recognized the male as the person he had formerly known only as Samson Kauhi. He also noticed that Kauhi was wearing sun glasses that looked like those worn by the male in the composite drawing. However, Officer Carreiro also testified that he was doubtful that he had the right persons because Kauhi did not appear to him to match the descriptions as to size

and complexion. "I felt that possibly somebody was just mad at these people initially, that's what I thought."

As Kauhi stood at the front door, Officer Carreiro, remaining outside, advised him that the police were investigating the murder of an elderly woman in her home on Rycroft Street and that he was following a lead regarding a Kimo and a Rachel in a red chevy pick-up. The officer informed Kauhi that police detectives wanted to talk to him at the Kaneohe station and that his cooperation would assist them in eliminating leads. Officer Carreiro testified as follows:

[OFFICER CARREIRO]: I told him, I made it clear to him that, you know, he doesn't have to come in a talk to these detectives. I told him he wasn't arrested. He could refuse. He was real cooperative, he was real calm, he was real cordial about the situation. He told me he—'yeah, I go down with you, Tom, and talk to the detectives[.]'

[PROSECUTOR]: Did he appear hesitant in any way to come down to the police station—

A: Not at all.

Q: —to answer some questions?

A: Not at all. He showed a lot of respect and concern.

Q: And did you emphasize to him that he could leave or refuse to go down to the police station at any time?

A: Yes, I did. I, in fact, stated that twice, once while initially explaining the situation and once right before we left the residence.

. . . .

Q: Did Mr. Kauhi, Samson Kauhi agree to go down to the police station?

A: Yes, he did.

Q: Did you force him to go down to the police station?

A: Not at all.

Q: Did you threaten him to go down to the police station?

A: Not at all.

Q: Did you coerce him in any way to go down to the police station?

A: No, ma'am.

. . . .

Q: At any point in time did you inform Mr. Kauhi that he was in the custody of the police department?

A: No, I did not.

. . . .

Q: And after Mr. Kauhi came out and talked to Detective Fitchett did Detective Fitchett indicate to you one way or another whether Mr. Kauhi was a suspect in this case?

A: Yes, he spoke to me concerning that issue.

Q: And did Detective Fitchett tell you that Mr. Kauhi was not the person that you folks were looking for?

A: Yes, he did.

Officer Kumaewa testified in kind:

[PROSECUTOR]: How did Samson Kauhi appear to you?

[OFFICER KUMAEWA]: Cool, calm, and collected. He didn't appear to be nervous. He—when informed of why we were there, he readily volunteered to accompany us to the Kaneohe Police Station.

Q: How did Mr. Kauhi get into the van?

A: He walked right into the van. We directed him to the van and he entered the van.

Q: Were any weapons drawn when he was walking towards the van? Did any of the officers have their weapons drawn?

A: No, ma'am.

Q: Did he walk into the van on his own accord, meaning on his own foot power?

A: Yes, ma'am.

Sometime between the officers' and Kauhi's and Rachel's departure from 45–582 Paleka Road and the interview of Kauhi by Detective Fitchett, Kauhi's rap sheet was printed out. It corroborated Aiu's belief that Kauhi had previously been imprisoned for robbery. At the beginning of the interview, Detective Fitchett asked the following questions:

Q: Okay, Samson, are you giving this statement of your own free will today?

A: Yes.

Q: And this interview is taking place at the Kaneohe police station, Crime Reduction Unit Office. Has anyone forced you to make this statement?

A: No.

Q: Okay, were you given any promises or favors to make this statement to you—to me?

A: No.

Detective Fitchett testified that at no time at the station was Kauhi under arrest and that Kauhi was free to leave at any time. Detective Fitchett did not read Kauhi his rights because "his physical appearance . . . led me to believe that he wasn't involved in the case at the time. . . . [H]e was big, was five eleven, and I estimate at least 200 plus pounds, and muscular build. And he was dark complexion[ed]." Detective Fitchett further testified as follows:

[PROSECUTOR]: So at the time you met Mr. Kauhi, did you believe that he was the male suspect described by Mr. Aiu?

[DETECTIVE FITCHETT]: No, I did not.

Q: So, did Mr. Kauhi agree to be interviewed by you?

A: Yes.

Q: Did he at any time say he did not want to make a statement?

A: No.

Q: Did he at any time say that he wanted to leave the police station and not give you a statement?

A: No.

Q: Did you threaten or coerce him into giving a statement?

A: No, I did not.

Q: How long did this interview take place?

A: Approximately 10 minutes.

Q: After this ten-minute interview with Mr. Kauhi, what did you think in regards to this investigation if he was the suspect described by Mr. Aiu?

A: That I was working on a lead that didn't pan out.

During the course of the ten-minute interview, Detective Fitchett asked questions regarding Kauhi's name, age, address, telephone number, social security number, whom he lived with, the nature of his relationship with Rachel, current substance abuse, ability to understand English, whether he had re-

cently been in the area of the murder, who owned the red truck, whether he knew Mrs. Lum, and where he was at the time of the murder.

Believing that Kauhi was not involved in the crime, Detective Fitchett did not arrest him. Later that same day, however, Abraham, the woman who allegedly assisted Kauhi in committing the burglary by restraining Mrs. Lum, contacted the police and gave a statement incriminating Kauhi, herself, and Harry Kauhi. Detective Fitchett then dispatched Officer Carreiro to find Kauhi and arrest him.

On April 24, 1995, Kauhi filed a motion to suppress, *inter alia*, the statements he gave to Officer Carreiro and to Detective Fitchett on November 17, 1994. After hearing argument on the motion, the motions court [hereinafter, the suppression court] ruled that Kauhi was neither unlawfully seized nor subjected to custodial interrogation in violation of his *Miranda* rights.

On appeal, Kauhi argues that he was subjected to a warrantless, non-consensual seizure when Officer Carreiro spoke with him on the door-step of 45–582 Paleka Road. Hence, concludes Kauhi, because the initial encounter was non-consensual, Kauhi's "consent" to speak with Detective Fitchett was "the fruit of the illegal encounter" and should have resulted in the suppression of Kauhi's statement to Fitchett. *State v. Trainor*, 83 Hawai'i 250, 925 P.2d 818 (1996). Alternatively, Kauhi argues that the statement must be suppressed because, in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Kauhi was subjected to custodial interrogation without the benefit of having been read his constitutional rights. *State v. Buch*, 83 Hawai'i 308, 926 P.2d 599 (1996).

In response to Kauhi's seizure claim, the prosecution contends that Kauhi was never seized and, in the alternative, if he was, he gave his prior consent. With regard to Kauhi's *Miranda* claim, the prosecution concedes interrogation but argues that Kauhi was never in custody. We are in accord with the prosecution on both points.

### 1. Seizure

Article I, section 7 of the Hawai'i Constitution protects persons against unreasonable searches and seizures. Whether Kauhi's statement should have been suppressed as a fruit of an unlawful warrantless seizure requires a two-part analysis: (1) "[A]t what point, if at all, [was] the individual 'seized'[;] .... [and (2) if so, whether,] prior to the seizure, the individual voluntarily and intelligently consented." *Trainor*, 83 Hawai'i at 256, 925 P.2d at 824 (1996) (quoting *State v. Kearns*, 75 Haw. 558, 565, 867 P.2d 903, 907 (1994)).

Generally, a person is "seized" if, "from an objective standpoint and given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave." *Trainor*, 83 Hawai'i at 256, 925 P.2d at 824 (citations omitted). Also, a person is seized "when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information." *Id.*

The factual circumstances in *Trainor* differ insofar as the encounter took place at the airport pursuant to law enforcement's drug interdiction efforts. In *Trainor*, a police officer approached Trainor in the airport for the sole purpose of investigating him for possible illegal drug trafficking. *Id.* Almost immediately, the officer's "queries escalated ... from an ostensibly casual conversation to a focused and intrusive quest for evidence of criminal wrongdoing." *Id.*

In this case, the officers arrived at 45–582 Paleka Road, a private residence, in an unmarked van, and with no show of force. Only Officer Carreiro approached the residence; the other two waited some distance away, but within earshot. Officer Carreiro knocked on the door and, upon asking to speak to "Kimo," Kauhi appeared at the door. Both Officers Carreiro and Kumaewa testified that Kauhi appeared calm and collected while Officer Carreiro informed Kauhi that police were conducting a murder investigation and that detectives at the police station would like to ask Kauhi and Rachel a few questions to follow up a lead.

After stating his purpose, Officer Carreiro immediately advised Kauhi that he was under no obligation to answer any questions or to go to the police station. Kauhi was informed on at least two occasions that he was not required to comply with police requests. Other than asking Kauhi investigatory questions such as whether he would be willing to go to the station and speak to detectives, Officer Carreiro did not make any further inquiries. Clearly, the officer's questions were not·"specifically designed to elicit responses that would either vindicate or implicate [Kauhi]." *Kearns,* 75 Haw. at 567, 867 P.2d at 908 (citation omitted). Nor did the exchange before "escalate[ ] ... from an ostensibly casual conversation to a focused and intrusive quest for evidence of criminal wrongdoing." *Trainor,* 83 Hawai'i at 256, 925 P.2d at 824.

Given the totality of the foregoing circumstances, it was reasonable for the court to conclude that a reasonable person would feel free to leave, or, as in this case, to terminate the encounter by simply refusing to accompany the police and returning into the home.

Kauhi argues, however, that he was seized, without his consent. On the record before us, we disagree. In addition to the fact that Kauhi appeared calm and collected and demonstrated a desire to be cooperative, Officer Carreiro testified that, after informing Kauhi that he was not obligated to go to the police station, Kauhi nonetheless stated, "[Y]eah, I go down with you, Tom, and talk to the detectives[.]" Kauhi then walked to the van and entered voluntarily. Thus, even if we accept Kauhi's contention that he was "seized," such "seizure" was with his consent. We therefore hold that at no time was Kauhi the victim of an unlawful seizure.

### 2. Miranda Warnings

Kauhi further argues that, because he was subjected to custodial interrogation, the police were required to give him *Miranda* warnings prior to questioning him. The prosecution, although conceding the issue of interrogation at the police station, argues that *Miranda* warnings were not required because Kauhi was never in custody and that, therefore, the court was correct in admitting Kauhi's statements.

"Two criteria are required before *Miranda* rights must be given: (1) the defendant must be under interrogation; and (2) the defendant must be in custody." *State v. Blanding,* 69 Haw. 583, 586, 752 P.2d 99, 100 (1988) (citation omitted). "A.'totality of the circumstances' test is used to determine whether the questioning is custodial, using factors such as 'time, place, and length of the interrogation, the nature of the questions asked, the conduct of the police at the time of the interrogation, and any other pertinent factors.'" *Id.* (quoting *State v. Russo,* 67 Haw. 126, 134, 681 P.2d 553, 560 (1984)) (citations omitted). This court has further stated that:

> Among the relevant circumstances to be considered are whether the investigation has focused on the suspect and whether the police have probable cause to arrest him prior to questioning. While focus of the investigation upon the defendant, standing alone, will not trigger the application of the *Miranda* rule, it is an important factor in determining whether the defendant was subjected to custodial interrogation.

*State v. Melemai,* 64 Haw. 479, 481, 643 P.2d 541, 544 (1982).

A suspect becomes the "focus" of an investigation "where the investigation has zeroed in upon the defendant as a prime suspect to the extent that the police would [be] justified in arresting him without a warrant on·probable cause." *State v. Patterson,* 59 Haw. 357, 359, 581 P.2d 752, 754 (1978). "[T]he requirement of [*Miranda*] warnings [is not] to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id.* (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). "[T]he fact that the questioning occur[s] in the police station is but one factor, albeit an important ·one, in deciding whether the defendant-appellant was in custody when he was questioned." *State v. Sugimoto,* 62 Haw. 259, 265, 614 P.2d 386, 391 (1980); *see also Patterson.*

As previously discussed, Kauhi was "free to go" while at 45–582 Paleka Road,

and the questions he was asked were merely investigatory in nature. Hence, because he was not subjected to custodial interrogation at that time, *Miranda* warnings were not required. However, Kauhi contends that he was custodially interrogated while at the police station. We agree with the prosecution that, although he was interrogated at the station, he was not in custody.

In *Blanding,* serviceman Robert Crow returned home following 24–hour duty on board the U.S.S. Reclaimer to find his wife raped and murdered. Upon request, the serviceman gave the Honolulu Police Department (HPD) a list of people whom he recalled being in his apartment prior to the murder. All ten, including Blanding, were male sailors on the same ship. A superior officer ordered the ten men to remain on board and provided a small quarters for HPD detectives to conduct questioning.

Blanding was subjected to a ten-minute interview and was not given *Miranda* warnings. During the interview, he was asked about "name, age, length of Naval service, length of acquaintance with the Crows, period when last in the Crows' apartment, and whereabouts on the night of the murder." *Id.* at 584, 752 P.2d at 100. At the end of the interview, Blanding voluntarily gave his fingerprints. However, he asked the police where they had found fingerprints in the Crow residence. This piqued the interest of police and caused them to run Blanding's prints first. A match was made and Blanding was subsequently arrested and read his *Miranda* rights.

On appeal, this court reasoned:

Although the interrogation took place in a small room, and the sailors' superior officer had ordered them to cooperate, this alone did not create a custodial situation.

At the time of Defendant's on-board interrogation, the police knew only that Defendant's name had been given to them by Crow as someone who had frequented the Crows' apartment prior to the murder. This was also true of the nine other sailors. Until the police got Defendant's fingerprints and were able to match them with those at the murder scene, the police had not "focused" their investigation on Defendant. The interview was for a short period of time and the questioning was of a very general nature with each of the ten sailors being asked the same questions. Even though the police chose to match Defendant's fingerprints before the other nine sailors, at the time of questioning, the overall investigation had not yet focused on Defendant.

Prior to the on-board interrogation, it cannot be said that Defendant was in custody and therefore, the police were not required to advise him of his *Miranda* rights at that time. The turning point of the investigation was the match of the fingerprints and the necessity of *Miranda* was triggered at that point.

*Id.* at 587, 752 P.2d at 101.

Kauhi's case is similar to that of *Blanding* in that the subject matter of the questioning was almost identical. The police knew only that Kauhi was a person who may have been in the area of Mrs. Lum's residence on the morning of the murder. They did not have evidence, such as fingerprints, connecting him to the crime. As with Blanding, Kauhi was interviewed in a small room, and the questioning lasted for approximately ten minutes. A significant difference, however, is that Kauhi consented to be interviewed whereas Blanding was commanded to cooperate with police. And, unlike Blanding, Kauhi had done nothing to pique police interest in him.

One factor that pointed the police to Kauhi personally was the fact that they were aware that Kauhi had a previous robbery conviction. However, even if this were more likely to make police suspect Kauhi, "the requirement of [*Miranda* ] warnings [is not] to be imposed simply because ... the questioned person is one whom the police suspect." *Patterson,* 59 Haw. at 360, 581 P.2d at 754 (1978) (citation omitted).

And, even though police had the composite drawing of someone who had been in the area at the time, it was substantially inconsistent with Kauhi's weight, build, and complexion. This caused the police to doubt that Kauhi was the person identified in the tip; thus, the police did not direct the focus of their investigation on him. In fact, following Kauhi's interview, the police issued a crime bulletin once again describing the suspect as a slim, fair-to-tan-complexioned male. Kauhi

was free to leave the station after the interview. He was not arrested until later that evening when Abraham implicated Kauhi in the homicide. Under the totality of the foregoing circumstances, we hold that Kauhi was not in custody and that, therefore, *Miranda* warnings not were required.

Accordingly, we affirm the suppression court's denial of Kauhi's motion to suppress statements made to police on November 17, 1994.

### C. *Cross–Examination*

On cross-examination, Kauhi sought to impeach Abraham by revealing her former romantic relationship with Kauhi and her "gang" membership with Kauhi and several of their mutual friends. Kauhi wished to demonstrate that, although Abraham was casting herself as a non-participant in the crime, she was actually a gang member who directly participated in the homicide. Further, Kauhi intended to show that her loyalty had changed as a result of being jilted by Kauhi and that she now was seeking revenge by testifying untruthfully.

■ On cross-examination, Abraham admitted that she and Kauhi had been romantically involved and had had sexual relations. The court permitted Kauhi to introduce a note from Abraham to Kauhi that stated that, no matter what anyone said or did, she thought he was "her dream come true" and her "ticket out of here." However, the court required partial redaction of the top portion of the note where several names under the heading of "Da Posse from Nalo" were listed.

Kauhi objected and moved to have the note admitted in its entirety, asserting that the note would demonstrate Abraham's bias against Kauhi as (1) his jilted and vengeful ex-girlfriend, and (2) an active fellow gang member now trying to inculpate Kauhi and exculpate herself as an unwilling participant. The court ruled that the "posse" portion of the note was not relevant because "there is no evidence in this case to show she was an unwilling participant ... and these people on

this [note] are after the fact, so this is tangential, highly prejudicial at this point in time." The trial court did, however, allow Kauhi to question Abraham about the names in the note when they were brought out in trial.

HRE Rule 609.1 provides, as a general rule, that "[t]he credibility of a witness may be attacked by evidence of bias, interest or motive." As previously noted, however, the extent of cross-examination rests within the sound discretion of the trial court. *Balisbisana*, 83 Hawai'i at 114, 924 P.2d at 1220.

The trial court permitted Kauhi to cross-examine Abraham at length regarding her romantic relationship with Kauhi. She admitted that Kauhi was her boyfriend and that they had had sexual relations together. The jury was also aware that Kauhi was living with Rachel and could certainly consider the "jilted" girlfriend theory in assessing Abraham's bias, interest, or motive in testifying as she did. Additionally, the trial court permitted cross-examination of Abraham on each of the names on the note as they came out at trial. Accordingly, the trial court did not abuse its discretion with respect to its evidentiary ruling regarding the note.

■ As previously noted, Abraham testified against Kauhi in return for permission to enter a DAG Plea. Kauhi sought to cross-examine Abraham about the DAG Plea in order to demonstrate that she was biased in favor of the prosecution. Abraham testified that, under the terms of the plea agreement, she would plead guilty to burglary in the first degree and that she would be permitted to file a motion for a deferred acceptance of the same. She also stated that she was aware that she could have been charged with murder, but added that she would not have been convicted because she did not kill Mrs. Lum. Kauhi attempted to inquire as to Abraham's understanding that the granting of the DAG Plea would mean that she would never under any circumstances serve any period of incarceration. The court did not allow that line of questioning because Kauhi failed to cite any authority to support such a position.[3] How-

---

**3.** Moreover, pursuant to HRS § 853–3, Abraham was potentially at risk of being sentenced to a period of incarceration in the event she violated any term or condition of her DAG Plea. *See* HRS § 853–3 (1993) ("Upon violation of a term or

condition set by the court for a deferred acceptance of guilty plea ... the court may enter an adjudication of guilt and proceed as otherwise provided.").

ever, the court permitted Kauhi to examine Abraham thoroughly about the extent of any bias she might have due to entering into a plea agreement and supervised release program with the prosecution, stating:

> [B]ecause the issue has been brought up as to whether or not the motive is there for [Abraham] to be biased, to lie, because she was granted supervised release, I think some inquiry should be made.... I will let him delve into her state of mind as to why she was granted supervised release.
>
> ....
>
> It can be argued by you that that was a sweetheart deal; she had supervised release, and now she's going to lie because she got granted that.

Kauhi also questioned Abraham's attorney, who testified that: (1) the terms of the plea agreement meant that Abraham would not be charged with murder, even if she so implicated herself; (2) at the sentencing hearing, the prosecution would remain silent; and (3) if she complied with the conditions of the plea for the duration of her term, the case would be dismissed and the arrest would be expunged.

Given the foregoing testimony, the jury knew that Abraham was not going to be charged with murder, even if she implicated herself. It was also clear to the jury that, should she abide by the terms of her plea agreement, she would not be incarcerated and that the charge would be expunged at the end of her term. Based on our review of the testimony, Kauhi was fully afforded the opportunity to demonstrate any bias Abraham may have had as a result of her DAG Plea. Accordingly, we hold that the trial court did not abuse its discretion in denying further cross-examination.

## IV. *CONCLUSION*

Based on the foregoing, we vacate Kauhi's convictions and remand this case to the circuit court for a new trial.