34 P.3d 1006

STATE of Hawai'i, Plaintiff–Appellant,

v.

Burt T. KETCHUM, Defendant–Appellee,

and

Donna Mae Wright, Defendant.

No. 23745.

Supreme Court of Hawai'i.

Nov. 9, 2001.

As Amended Nov. 20, 2001.

Mangmang Qiu Brown, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellant State of Hawai'i.

Glenn D. Choy, on the briefs, for the defendant-appellee Burt T. Ketchum.

MOON, C.J., LEVINSON, NAKAYAMA, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiff-appellant State of Hawai'i [hereinafter, the "prosecution"] appeals from the findings of fact (FOFs), conclusions of law (COLs), and order of the first circuit court, the Honorable Russell Blair presiding, granting the defendant-appellee Burt T. Ket-

chum's motion to suppress. On appeal, the prosecution asserts that the circuit court erred in suppressing Ketchum's responses, on three separate occasions, to Honolulu Police Department (HPD) officers' questions regarding his residential address; in each instance, he indicated that his address was 91–467B Fort Weaver Road. Specifically, the prosecution contends that COL Nos. 5 through 9 [1] are wrong and, therefore, that the circuit court erroneously concluded that the officers had subjected Ketchum to "custodial interrogation," on two of the occasions, without first informing him, *inter alia*, of his constitutional right against self-incrimination and, on the third occasion, in disregard of Ketchum's invocation of his constitutional right to remain silent. We disagree and, accordingly, affirm the circuit court's order granting Ketchum's motion to suppress.

## I. BACKGROUND

At approximately 7:00 a.m. on January 26, 2000, a team of law enforcement officers from three different HPD divisions executed a search warrant upon a residence located at 91–467B Fort Weaver Road.[2] The team included approximately forty "Specialized Services Division" (SSD) officers, between twelve and fifteen "Narcotics–Vice Division" (NVD) officers, and approximately eight officers from the "Crime Reduction Unit" (CRU). Prior to executing the warrant, the officers were briefed; the SSD officers, in particular, were informed that they would be "raid[ing]" a residence and that the object of the raid was to find drug contraband.

SSD Officer Alan Masaki's assignment, as a member of the SSD "entry team," [3] was to enter the residence and "secure" the occupants. The entry team knocked on the residence's front door, announced their office and purpose, and, receiving no response from anyone within, forced open the front door. Of the nine members of the "entry team"

---

1. We quote COLs Nos. 5 through 9 *infra* in section III.

2. The record reflects that the search warrant authorized a search of both the "two bedroom residence located at 91–467 B Fort Weaver Road" and "the person of ... Donna Mae Wright." The object of the search was to obtain evidence of Wright's alleged drug dealing. The

search warrant expressly named only Wright and did not name Ketchum. Wright is not a party to this appeal.

3. Of the forty SSD officers assigned to the "raid" team, twenty were assigned to an "entry team"—of which nine made the initial entry into the residence—and twenty were assigned to secure the perimeter of the residence.

who initially entered the residence, Officer Masaki was "in position number four." Officer Masaki testified at the suppression hearing that he was the first officer to enter the master bedroom [hereinafter, "Bedroom 1"], in which he "located" Ketchum and codefendant Donna Mae Wright "on the bed." [4] He "secured" Ketchum and Wright and, although Ketchum was not immediately handcuffed, Officer Masaki acknowledged at the suppression hearing that Ketchum, nonetheless, was "detained" and "not free to leave."

"[A]bout a minute or so" after entering the bedroom, Officer Masaki asked Ketchum for his "personal information," including his residential address; [5] Ketchum replied in relevant part that he resided at 91–467B Fort Weaver Road. Ketchum was not handcuffed at the time Officer Masaki requested his address. As noted *supra* in note 4, it appears, however, that Officer Masaki, before asking Ketchum for his personal information, had ordered Ketchum and Wright to "show [him] their hands," an order they both "complied [with] without incident." Officer Masaki did not "advise [Ketchum] of his constitutional rights" before questioning Ketchum, and the record contains no indication that he did so at any point during their encounter.

According to Officer Masaki, his purpose in asking Ketchum to provide his address was to include it in a "follow-up report to identify the occupant that I located." [6] At

the suppression hearing, Officer Masaki asserted that obtaining such personal information was "normal procedure" and that, while the personal information he obtained from Ketchum was also obtained for "booking purposes" at the time an arrestee is formally "booked," he did not obtain Ketchum's address for booking purposes.

Officer Masaki also testified that he was aware, due to his training as a police officer, that establishing Ketchum's address as the same as that where drug contraband was found would assist in prosecuting him for constructive possession of any drug contraband subsequently discovered in the residence. However, Officer Masaki denied questioning Ketchum "in any way about this particular investigation." Officer Masaki's encounter with Ketchum lasted only "a few minutes," which ended when he "turned [Ketchum and Wright] over," "without any incident," to the NVD officers.

Meanwhile, the remainder of the "entry team" had "secured" the other occupants of the residence. In a second bedroom [hereinafter, "Bedroom 2"], officers located two of Wright's teenage sons and her teenage daughter and, in the living room, Wright's third son, also a teenager. According to HPD Officer George Flores,[7] who prepared an affidavit that the prosecution submitted to the circuit court in connection with the preliminary hearing conducted in this matter,

---

**4.** In his "Follow Up Report," attached as "Exhibit A" to the prosecution's memorandum in opposition to Ketchum's motion to sever his trial from Wright's, Officer Masaki described his encounter with Ketchum and Wright as follows:

> I proceeded into the residence and turned left into the first bedroom. The door was in the open position and I immediately encountered two adults lying on the bed. I stated Police, we have a search warrant. I then instructed them to show me their hands and they complied without incident.

Another officer's follow-up report included a diagram of the two bedroom apartment. This diagram depicted the front door as opening directly into a living room, with an opening to the kitchen (located across the living room opposite the front door) in the opposite living room wall. Bedrooms 1 and 2 were separated by a bathroom, the doors to all three opening into a slight recess at the left side of the living room. The right wall of Bedroom 1 was partially shared by the left wall of the living room, the remainder of Bedroom 1's right wall forming an outside wall that stood directly to the left of the apartment's

front door, outside of which the nine entry officers gathered before forcibly opening the front door.

**5.** Officer Masaki testified at the suppression hearing that the information he obtained from Ketchum consisted of "[j]ust his personal information regarding his name, date of birth, Social Security number, address[,] height, [and] weight."

**6.** Officer Masaki's "Follow Up Report," *see supra* note 4, indeed includes, under the subheading "Occupants Identified," Ketchum's name, age, Social Security number, date of birth, height, weight, and address, as well as Ketchum's phone number and the color of his eyes and hair. The report does not, however, indicate how Officer Masaki obtained this information.

**7.** Officer Flores was assigned to "oversee" the execution of the search warrant. He had obtained the search warrant, and it appears that he was a member of the initial entry team. Officer Flores did not testify at the suppression hearing.

"[e]veryone within the residence w[as] detained." Once the SSD officers gave an "all clear sign," the occupants were "turned over" to the NVD officers.[8]

Within approximately ten minutes of his encounter with Officer Masaki, Ketchum was photographed in Bedroom 1 and escorted, together with the other occupants of the residence, to a "central location"—in this case, the residence's garage. At some point during this time frame, an officer "flex handcuffed" Ketchum "with plastic ties."

NVD Detective Robert Towne's assignment was to "supervise the men assigned to do what we call the booking," which occurred in the garage. Detective Towne testified at the suppression hearing that, once the SSD entry team indicated that "all [is] clear," the occupants were photographed where they were found within the residence and then moved to the garage so that they could be "booked."[9] He first encountered Ketchum, already "flex handcuffed," in the garage. At the suppression hearing, Detective Towne testified that, while he recalled assigning an officer the task of "booking" Ketchum in the garage, he did not specifically recall the officer's identity. Detective Towne acknowl-

edged that, at the time Ketchum was in the garage, he was in "custody" and "not free to leave."

As for obtaining Ketchum's address as part of the "field booking" process, Detective Towne asserted that the information appearing on the "booking sheet"—a preprinted HPD form that, generally, an arresting officer completes by hand in the field and that contains an arrestee's "personal information," including his or her address—assisted in "identifying the person" and was helpful in the event that it became subsequently necessary to serve a summons upon or otherwise contact the arrestee. However, Detective Towne acknowledged that, as a result of his training as a police officer, he was aware of the concept of "constructive possession" and that, in this case, establishing Ketchum's address as that at which drug contraband was found would assist in prosecuting him. The record fails to reflect, *inter alia*, that an officer advised Ketchum of his right against self-incrimination at any time before or during the field booking process.

HPD Officer Michael Kaya [10] first encountered Ketchum in the garage, at which time an officer handed him a "booking sheet" that

**8.** Officer Flores's police report, attached as "Exhibit A" to Ketchum's motion for a bill of particulars or, in the alternative, to dismiss, reflects that at "about" 6:49 a.m. the officers "executed the search warrant" and that they "secured" the "scene ... at about" 6:55 a.m., which was then "turned over" to the NVD officers "at about" 6:57 a.m. Officer Flores served the warrant upon Wright "at approximately" 6:50 a.m.

**9.** Detective Towne's "Follow Up Report," attached as "Exhibit A" to the prosecution's memorandum in opposition to Ketchum's motion to suppress, stated that he "waited until the all clear sign was given by the Special Services Division before entering the home." In his report, he further asserted, under the heading "Persons Detained," that,

[a]fter being given the all clear sign by the Special Services Division, the location of all persons within the house were noted down by Officer Gabur and then escorted from the house to the open garage area where information such as their name date of birth etc. was obtained.

(Internal capitalization omitted.) Detective Towne's report also indicates that "[a]rrest and [w]arrant checks were also performed at this time."

**10.** In its proffer at the suppression hearing regarding Officer Kaya's testimony, the prosecu-

tion asserted that he was "the arresting officer." However, the record reflects some confusion with respect to the particular officer who formally "arrested" Ketchum. Officer Flores's affidavit, *see supra* at 5, asserted that he "placed ... under arrest" Ketchum, Wright, and Wright's two eldest sons. And, at the preliminary hearing, Officer Flores testified that he had formally arrested Ketchum, Wright, and Wright's two eldest sons:

Q. Based on what was found within ... bedroom [1] were [Ketchum and Wright] eventually placed under arrest?

A. Yes, they were.

. . . .

Q. And after they were placed under arrest, specifically talking about Mr. Ketchum, did you obtain general information from him[,] such as date of birth, residence[,] that type of thing?

A. Yes.

Q. And as far as his residence, where did he tell you he resided at?

A. Information was given that he resided at the address, 91–467 Bravo, Fort Weaver Road. Officer Flores clarified, however, that he was not the officer who had flex handcuffed Ketchum:

Q. Officer, did you arrest Mr. Ketchum?

A. I was the arresting officer.

Q. So, you're the person who puts on the cuffs and so forth?

**114**

contained the "pertinent information from the arrested individual," including Ketchum's residential address. Officer Kaya testified that Ketchum was, at the time he encountered him, "under arrest." Officer Kaya transported Ketchum to the Pearl City Police Station. Officer Kaya testified that the "booking sheet" is a form that officers use in the field at the time they arrest a suspect in order to facilitate the formal booking process that occurs later at the police station. He affirmed that the "booking sheet" is "used in all cases involving arrestees[.]" [11]

Detective Towne confirmed that, in a raid such as that conducted in the present case,

> A. No, I wasn't the person who put on the cuffs.
> Q. Okay, who did that?
> A. I'm not sure at this time.

Officer Flores further clarified that he was not the officer who had actually questioned Ketchum regarding Ketchum's personal information and that it was HPD Officer Itomura who first informed him that Ketchum had stated that his address was 91–467B Fort Weaver Road. As to when and by whom Ketchum was handcuffed, Officer Flores could be no more precise than to acknowledge that, at some point, "officers were directed to put the cuffs on." Officer Flores's police report, see supra note 8, also asserts that he "arrested" Ketchum, Wright, and Wright's two eldest sons "[b]ased on the observations of" officers who conducted the search and located drug contraband in both Bedrooms 1 and 2. However, the testimony adduced at the suppression hearing is silent with regard to when and by whom Ketchum was formally arrested.

11. The circuit court examined Officer Kaya with regard to the "field booking procedure" as follows:

> THE COURT:.... Normally[,] who fills out the booking sheet, is it the arresting officer or is it somebody other than the arresting officer?
> [OFFICER KAYA]: Sir, it could go either way. If there's an arresting officer, sometimes they'll do it. If there's another person available, which on that day there w[ere] numerous people, numerous officers around, they may assist him by filling it out for him.
> THE COURT: So any officer on the scene with the information might fill out the booking [sheet]?
> [OFFICER KAYA]: Yes. It's—it's kind of a fill in the blank worksheet, so to speak, just to make sure we have all the necessary information.
> THE COURT: So that's handwritten and then when you get back to the Pearl City station or whatever station, that's handed over to the person who is manning the booking station?
> [OFFICER KAYA]: Yes.

officers on the scene complete a "booking sheet" with regard to each arrestee. As a general matter, Detective Towne asserted that, when the police conduct a drug raid, anyone located within the building is not allowed to leave because they are "suspects" regarding either actual or constructive possession of drug contraband. Detective Towne further explained that, as a general practice, if an individual is located in a room in which drugs are subsequently found, then the individual is arrested "regardless if that's where he [or she] lives or not." However, if no incriminating evidence is discovered in the same room as a "visitor," then "we will release [the visitor] as soon as possible." [12]

> THE COURT: And they take that handwritten information and type it up?
> [OFFICER KAYA]: Yes.
> THE COURT: In the booking procedure, have you ever been assigned, by the way, to do a booking?
> [OFFICER KAYA]: Yes, while I was at the receiving desk.
> THE COURT: Okay. Do you get the information, when you're doing a booking, a defendant comes in, do you just take the information off the booking sheet or do you [t]ry to confirm that with the defendant at the time of the booking or—
> [OFFICER KAYA]: You usually take it right off of the booking [sheet] unless there's any information that's contradictory, missing, or if maybe there's some information right on the computer[, such as that] the individual's been arrested previously, it may. But in most cases you just [take the information] right off of the booking sheet.
> THE COURT: So that the data for booking is actually acquired in the field rather than at the booking desk?
> [OFFICER KAYA]: Yes, it is.

12. Specifically, Detective Towne testified, under cross-examination by Ketchum's counsel, as follows:

> A. Our—our general practice would be, say if he's found in what we designate as Bedroom 1, if we find evidence in Bedroom 1 he'll be arrested.
> Q. Okay.
> A. Regardless if that's where he lives or not.
> Q. Okay. And that's because he's found in Bedroom 1?
> A. Correct.
> Q. Now, if you were to go in and you determine that somebody was a mere visitor—
> A. Correct.
> Q. —isn't there a chance that you could say, he, you can—you can leave to that person?

After supervising the field booking process in the garage, Detective Towne entered the residence and assisted other officers in searching Bedroom 1. In searching an "[a]r-moire" drawer, Detective Towne found various items of alleged drug paraphernalia, which were, together with other items that HPD Officer Donald Marumoto located in Bedroom 1 between approximately 7:10 a.m. and 7:40 a.m., the items that predicated Ketchum's prosecution in the present matter.[13]

NVD Detective Renold Itomura was the "case supervisor." His task was to "oversee the [execution of the] warrant, the booking process, ... the arrest, and the collection of evidence." Approximately thirteen hours after the raid, Detective Itomura sought to interview Ketchum, who had remained in custody since his arrest at the police station. Detective Itomura advised Ketchum, *inter alia*, of his constitutional rights to remain silent and to have an attorney present during any questioning. On an HPD "waiver" form, Ketchum indicated that he understood his rights, did not want an attorney, but did not want "to tell [Detective Itomura] what happened[.]" In response to Detective Itomura's request, Ketchum signed and dated the form and wrote his address, "91-467 Ft Weaver Rd," on blank lines on the form predesignated for each piece of information. Like Officer Masaki and Detective Towne,

Detective Itomura knew, as a result of his training as a police officer, that Ketchum's admission regarding his address would assist in prosecuting him.

## II. STANDARD OF REVIEW

■ The circuit court's determinations that police officers had subjected Ketchum to "custodial interrogation," on two separate occasions, absent the warnings required by article I, section 10 of the Hawai‘i Constitution (1982), quoted *infra* in section III, and, on a third occasion, in disregard of Ketchum's invocation of his right to remain silent, constitute conclusions of constitutional law, which, consequently, this court reviews *de novo* on appeal, under the "right/wrong" standard; to the extent that these conclusions of law implicate constitutional questions, this court freely "exercise[s][its] own independent constitutional judgment, based on the facts of the case." *State v. Ah Loo*, 94 Hawai‘i 207, 209, 10 P.3d 728, 730 (2000) (citations omitted).

## III. DISCUSSION

In granting Ketchum's motion to suppress, the circuit court concluded in relevant part:

5. Ketchum, from the point he was detained by Officer Masaki, was in custody.

A. Yeah. Say we go in there and Jane Doe is a visitor, she's, say, she's in the living room and there's nothing incriminating, no evidence in the living room, we will release her as soon as possible.
Q. Okay. But in this situation, Burt Ketchum is in the bedroom where drugs are found, correct?
A. Correct.
Q. So you didn't release him; correct?
A. Detective Itomura could probably answer that question a little better than I could.

**13.** Officer Flores's police report, *see supra* note 8, and Detective Towne's report, *see supra* note 9, reflect that, at approximately 8:10 a.m., Detective Towne found a black leather purse, inside of which were two glass pipes with a cloth pouch; each pipe contained a whitish residue. Also inside the purse were seven small clear plastic bags, five of which contained a whitish residue, and a "small coin type purse." The black purse also contained two lighters and a "metal scraper type rod."

HPD Officer Donald Marumoto also located various items of alleged drug contraband in Bed-

room 1 between 7:10 a.m. and 7:40 a.m. Officer Marumoto found some of these items on a desk, in close proximity to three envelopes addressed to Wright. He found the remainder of these items in a dresser drawer, which also contained "a lot" of "woman's clothes." Officer Marumoto did not testify at the suppression hearing. In Bedroom 2, an officer located a "sentry safe" atop a dresser; inside the safe, the officer found three plastic bags containing a crystalline substance and six packets of what appeared to be marijuana.

Ketchum filed a motion for a bill of particulars, which sought clarification as to "the location of the alleged dangerous drugs and drug paraphernalia alleged to have been illegally possessed by Ketchum when discovered by police." In its memorandum in opposition, the prosecution responded that Ketchum was "charged with all of the drugs and drug paraphernalia located within the bedroom where he was found lying on the bed." At the hearing conducted in connection with Ketchum's motion for a bill of particulars, the prosecution maintained its position that the drug contraband located in Bedroom 1 predicated the charges against Ketchum.

6. At the point that Officer Masaki questioned Ketchum, Ketchum was a focus of police investigation. Officer Masaki knew, or should have known, that his communication regarding Ketchum's address was reasonably likely to elicit an incriminating response as to the constructive possession of the drug contraband.

7. Information as to Ketchum's address gathered by Detective Towne suffers from the same constitutional infirmities as that gathered by Officer Masaki.

8. As to subsequent questioning by Officer Itomura at the station, it is again the case that Officer Itomura subjected Ketchum to custodial questioning. And again, the routine booking question exception does not apply, as Officer Itomura knew, or should have known, that his request to have Ketchum provide his address was reasonably likely to elicit an incriminating response as to the [charge of] constructive possession of drug contraband.

9. Furthermore, Officer Itomura obtained from Ketchum an express refusal to discuss the case. Once the right to counsel has been invoked, all questioning must cease. *State v. Mailo,* 69 Haw. 51, 731 P.2d 1264 (1987). Herein, once Ketchum was informed of his right to counsel, and thereafter refused to speak, Officer Itomura proceeded to request Ketchum's address. Said request was improper.

(Internal capitalization altered.). The prosecution argues that these COLs are wrong. Before addressing the prosecution's arguments, we review the principles of constitutional law that are germane to our analysis.

A. *Article I, Section 10 Of The Hawai'i Constitution*

 Article I, section 10 of the Hawai'i Constitution provides in relevant part that "[n]o person shall ... be compelled in any

criminal case to be a witness against oneself." In *State v. Santiago,* 53 Haw. 254, 492 P.2d 657 (1971), this court first recognized that the foregoing section [14] provides "an independent source" from that of the fifth amendment to the United States Constitution [15] for the "protections which the United States Supreme Court enumerated" in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). 53 Haw. at 266, 492 P.2d at 664. Thus, as a matter of state constitutional law, article I, section 10

> requires that before reference is made at trial to statements made by the accused during custodial interrogation, the prosecutor must first demonstrate that certain safeguards were taken before the accused was questioned.... [T]he prosecutor must show that each accused was warned that he [or she] had a right to remain silent, that anything said could be used against him [or her], that he [or she] had a right to the presence of an attorney, and that if he [or she] could no[t] afford an attorney one would be appointed for him [or her].... [U]nless these protective measures are taken, statements made by the accused may not be used either as direct evidence in the prosecutor's case in chief or to impeach the defendant's credibility during rebuttal or cross-examination.[16]

*Id.* The *Santiago* court expressly "base[d] [its] decision on [its] belief that the privilege against self-incrimination bestows on every accused the right to choose whether or not to confess to the commission of a crime." *Id.* Thus, "[i]n order to protect that freedom of choice, we believe that every accused[ ] must be informed of the fact that he [or she] has certain rights under the Hawaii Constitution." *Id.* As we observed in *Santiago,* article I, section 10 "maintains [the] ... value of protecting the accused's privilege to freely

**14.** At the time that this court published its opinion in *Santiago,* the protection against self-incrimination was, in language identical to that presently set forth in section 10 (section 10's gender neutrality aside), contained in article I, section 8.

**15.** The fifth amendment to the United States Constitution provides in relevant part that "[n]o person ... shall be compelled in any Criminal Case to be a witness against himself[.]" Because we decide this matter on the basis of state consti-

tutional law, we do not address the question whether the officers violated Ketchum's constitutional rights under the United States Constitution.

**16.** With respect to precluding the introduction of custodial statements at trial for the purpose of impeaching a defendant, article I, section 10 accords greater protection to an accused than does the fifth amendment. *See Santiago,* 53 Haw. at 263–67, 492 P.2d at 662–65.

choose whether or not to incriminate himself [or herself]," because "[t]o convict a person on the basis of statements procured in violation of his [or her] constitutional rights is intolerable." *Id.* at 267, 492 P.2d at 665.

The "*Miranda* rule," as *Santiago* and our subsequent cases makes clear, is, at core, a constitutionally prescribed rule of evidence [17] that requires the prosecution to lay a sufficient foundation—*i.e.*, that the requisite warnings were administered and validly waived before the accused gave the statement sought to be adduced at trial—before it may adduce evidence of a defendant's custodial statements that stem from interrogation during his or her criminal trial.[18] *See, e.g., Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731 ("Absent *Miranda* warnings and a valid waiver of them, statements obtained from a person subjected to custodial interrogation are inadmissible in a subsequent criminal proceeding brought against the person." (Citation omitted.)); *State v. Hoey*, 77 Hawai'i 17, 33, 881 P.2d 504, 520 (1994) ("*Miranda* imposed upon the prosecution the burden of demonstrating in any given case that these 'procedural safeguards' had been employed[.] … If these minimal safeguards are not satisfied, then statements made by the accused may not be used either as direct evidence … or to impeach the defendant's credibility[.]" (Citations and internal quotation signals omitted.)); *State v. Nelson*, 69 Haw. 461, 467–68, 748 P.2d 365, 369 (1987) (noting that "the question [in *Santiago*] was the admissibility of statements made during custodial interrogation" and reaffirming the principle that, absent the procedural safeguards enumerated in *Miranda* and *Santiago*, " 'statements made by the accused may not be used either as direct evidence in the prosecutor's case in chief or to impeach the defendant's credibility during rebuttal or cross-examination' " (quoting *Santiago*, 53 Haw. at 266, 492 P.2d at 664)); *State v. Ikaika*, 67 Haw. 563, 566, 698 P.2d 281, 283–84 (1985) ("It is well recognized that before the [prosecution] may use statements stemming from custodial interrogation, it must first demonstrate the use of procedural safeguards effective to secure the privilege against self-incrimination." (Citations and footnote omitted.)); *Santiago*, 53 Haw. at 262–63, 492 P.2d at 662 (" '[T]he warnings required … are … prerequisites to the admissibility of any statement made by a defendant,' … and in the absence of a showing that the accused was warned of his [or her] rights, 'no evidence obtained as a result of interrogation can be used against him [or her].' " (Quoting *Miranda*, 384 U.S. at 476, 479, 86 S.Ct. 1602.) (Original parentheses changed to brackets and internal citations omitted.)).

The prosecution's burden of establishing that the requisite warnings were given, however, is not triggered unless the totality of the circumstances reflect that the statement it seeks to adduce at trial was obtained as a result of "custodial interrogation," which, as the United States Supreme Court defined it in *Miranda*, consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her]

17. *Cf. Dickerson v. United States*, 530 U.S. 428, 432, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) ("We hold that *Miranda*, being a constitutional decision of this Court, may not be in effect overruled by an Act of Congress" and, therefore, that "*Miranda* and its progeny in this Court *govern the admissibility of statements made during custodial interrogation in both state and federal courts.*" (Emphasis added.)).

18. The present matter does not raise the question whether Ketchum's statements were "voluntary," as a matter of substantive constitutional due process, under either article I, section 5 of the Hawai'i Constitution (1978) or the fourteenth amendment to the United States Constitution. *See, e.g., State v. Bowe*, 77 Hawai'i 51, 58–60, 881 P.2d 538, 545–47 (1994) (addressing the question whether the defendant's statement was involuntarily given and, thereby, obtained by violating the defendant's right to due process protected by article I, section 5). Nor have the parties advanced the question whether any of Ketchum's statements were unreasonably obtained or otherwise tainted fruit of a poisonous tree for purposes of article I, section 7 of the Hawai'i Constitution (1978). *See, e.g., State v. Kauhi*, 86 Hawai'i 195, 203–204, 948 P.2d 1036, 1044–45 (1997) (addressing the question whether a defendant's statement was unreasonably obtained because it constituted fruit of an unlawful warrantless arrest under article I, section 7). Accordingly, our discussion herein is limited to whether Ketchum's statements are inadmissible in his criminal trial because of the protection accorded him against self-incrimination by article I, section 10.

freedom of action in any significant way." [19] 384 U.S. at 444, 86 S.Ct. 1602 (footnote omitted); *see also Hoey*, 77 Hawai'i at 33, 881 P.2d at 520 ("the privilege [against self-incrimination] is jeopardized when an individual is taken into custody or otherwise deprived of his [or her] freedom by the authorities in any significant way and subjected to questioning") (citations, original ellipsis points, and internal quotations signals omitted); *State v. Melemai*, 64 Haw. 479, 481, 643 P.2d 541, 543 (1982); *State v. Patterson*, 59 Haw. 357, 359, 581 P.2d 752, 754 (1978). In other words, the defendant, objecting to the admissibility of his or her statement and, thus, seeking to suppress it, must establish that his or her statement was the result of (1) "interrogation" that occurred while he or she was (2) "in custody." *See, e.g., Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731 ("the requirement of *Miranda* warnings is triggered by 'two criteria': '(1) the defendant must be under interrogation; and (2) the defendant must be in custody' " (quoting *State v. Kauhi*, 86 Hawai'i 195, 204, 948 P.2d 1036, 1045

---

**19.** The concurring and dissenting opinion "disagree[s] with the totality of the circumstances formulation seemingly adopted" by us "in this case." Acoba and Ramil, JJ., concurring in part and dissenting in part [hereinafter, "concurring and dissenting opinion"], at 129, 34 P.3d at 1028. However, this court consistently addresses the question whether a defendant has been subjected to custodial interrogation within the context of the totality of the circumstances. *See, e.g., Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731 ("[t]o determine whether 'interrogation' is custodial,' *we look to the totality of the circumstances*, focusing on the 'place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and any other relevant circumstances" (quoting *State v. Melemai*, 64 Haw. 479, 481, 643 P.2d 541, 544 (1982) (quoting *State v. Sugimoto*, 62 Haw. 259, 265, 614 P.2d 386, 391 (1980))) (emphasis added) (brackets in original omitted); *State v. Kauhi*, 86 Hawai'i 195, 203 948 P.2d 1036 (1997) (" *[a] "totality of the circumstances" test is used* to determine whether the questioning is custodial' " (quoting *State v. Blanding*, 69 Haw. 583, 586, 752 P.2d 99, 100 (1988) (quoting *State v. Russo*, 67 Haw. 126, 134, 681 P.2d 553, 560 (1984) (omitting some citations)))) (emphasis added); *State v. Kuba*, 68 Haw. 184, 188–90, 706 P.2d 1305, 1309–10 (1985) (assessing the totality of the circumstances in holding that the roadside questioning of a motorist did not constitute custodial interrogation); *State v. Wyatt*, 67 Haw. 293, 299, 687 P.2d 544, 549 (1984) ("[w]hether interrogation was carried on in a custodial context is dependent upon *the totality of the circumstances* surrounding the questioning" (citing *State v. Paahana*, 66 Haw. 499, 503, 666 P.2d 592, 595 (1983), and *Melemai*, 64 Haw. at 481, 643 P.2d at 544 (1982)) (emphasis added); *State v. Patterson*, 59 Haw. 357, 361, 581 P.2d 752, 755 (1978) ("whether the defendant was in custody or otherwise deprived of his [or her] freedom of action for *Miranda* purposes is to be *determined from the totality of the circumstances, objectively appraised*" (citing *Lowe v. United States*, 407 F.2d 1391 (9th Cir.1969), and *State v. Tsukiyama*, 56 Haw. 8, 525 P.2d 1099 (1974)) (emphasis added); *State v. Kalai*, 56 Haw. 366, 369, 537 P.2d 8, 11 (1975) ("[w]hat constitutes custodial interrogation outside of the police station, how-ever, *necessarily depends upon the circumstances of the particular case;* and whether the compulsive factors with which *Miranda* was concerned are present must be *determined from the totality of the circumstances*" (citing *United States v. Montos*, 421 F.2d 215, 222–223 (5th Cir.1970), *cert. denied* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970)) (emphases added). We therefore do not understand our opinion to be "adopt[ing]" a new approach in analyzing whether custodial interrogation has occurred for *Miranda* purposes. Rather, we do two things in this opinion, both as a matter of state constitutional law: (1) we reject the notion of articulating a distinct "exception" to the interrogation requisite for purposes of triggering *Miranda* warnings on the basis that a particular question is in the nature of a "routine booking question," *see infra* section III.A.1; and (2) we clarify the circumstances that will suffice to reflect that a person's freedom of action has been "significantly" deprived, such that he or she is "in custody" for *Miranda* purposes, *see infra* section III.A.2. As such, our opinion fits squarely within the "framework" for resolving the *Miranda* issues that the concurring and dissenting opinion articulates. *see* concurring and dissenting opinion at 129–30, 34 P.3d at 1028–29 (specifically, prongs (1)(b) and (2)), and believes that we have abandoned. For example, our discussion concerning the "custody" prong of orthodox *Miranda* analysis, *see infra* section III.A.2, merely provides some further guidance to the courts, the bar, and law enforcement officers by which to discern when, under circumstances in which a person has not been formally arrested, he or she nonetheless has been "significantly" deprived of his or her freedom of action such that he or she is "in custody." Where we perhaps differ with the concurring and dissenting opinion is that we do not believe that the concrete answers to the abstract propositions set forth in its "framework" are invariably as self-evident as it suggests, particularly where the degree to which an infringement upon a person's liberty becomes significant in one particular constitutional context is not coextensive with the significance of the deprivation of the person's freedom of action in another. *See, e.g., Ah Loo*, 94 Hawai'i at 210–12, 10 P.3d at 731–33.

(1997) (quoting *State v. Blanding*, 69 Haw. 583, 586, 752 P.2d 99, 100 (1988))) (original brackets omitted)).

### 1. *Interrogation*

 Generally speaking, " 'interrogation,' as used in a *Miranda* context, [means] 'express questioning or its functional equivalent.' " *Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731 (quoting *Melemai*, 64 Haw. at 481 n. 3, 643 P.2d at 544 n. 3 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980))) (some internal quotation signals omitted) (brackets in original). However, whether a police officer has subjected a person to "interrogation" is determined by objectively assessing the "totality of the circumstances." *Id.; see also Ikaika*, 67 Haw. at 567, 698 P.2d at 284. With a focus upon the conduct of the police, the nature of the questions asked, and any other relevant circumstance, the ultimate question becomes "whether the police officer should have known that his [or her] words or actions were reasonably likely to elicit an incriminating response" from the person in custody. *Ikaika*, 67 Haw. at 567, 698 P.2d at 284.

Be that as it may, the Intermediate Court of Appeals (ICA) has held that,

> during an investigative stop or after an arrest, requests for items of information within the "routine booking question exception" are not, in most cases, interrogation. These items of information are: name, address, height, weight, eye color, date of birth, current age, *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), and, logically, social security number.

*State v. Blackshire*, 10 Haw.App. 123, 134, 861 P.2d 736, 742, *cert. denied*, 75 Haw. 581, 863 P.2d 989 (1993), *overruled on other grounds by Ah Loo*, 94 Hawai'i at 211, 10 P.3d at 732. In the ICA's view, however, "the routine booking question exception does not apply: (1) when the police request information designed to elicit an incriminatory admission; or (2) where the police should have known that their communication was reasonably likely to elicit an incriminating response." *Id.* (citations omitted).

Applying the "routine booking question exception" in *Blackshire*, the ICA held that an officer's inquiries regarding the defendant's name, phone number, and domicile "were not interrogation because [the questions] came within the routine booking exception." 10 Haw.App. at 136, 861 P.2d at 743. However, when it came to the officer's inquiry regarding the defendant's local residence, inasmuch as the officer knew beforehand that the defendant had sojourned in a hotel room in which a drug-sniffing dog had alerted to the presence of narcotics and that other officers were in the process of obtaining a warrant to search the room, the ICA determined that "[t]he routine booking exception did not apply because the officer should have known that his question was reasonably likely to elicit an incriminating response"; consequently, the ICA held that the question constituted "interrogation." *Id.* at 126–27, 137, 861 P.2d at 739–40, 743.

The ICA's formulation of the routine booking question exception impliedly acknowledges that the "exception" is, when scrutinized, no real exception at all. Rather, whether a question is a "routine booking question," the answer to which, generally speaking, is not reasonably likely to be incriminating, is simply an aspect of the totality of the circumstances considered in determining whether the questioning officer has subjected the accused to "interrogation." As the ICA itself observed in *Blackshire*, to the extent that a police officer reasonably should have known that his or her question was likely to elicit an incriminating response, the officer's question, even if a "routine booking question," constitutes "interrogation." 10 Haw.App. at 134, 861 P.2d at 742. Moreover, to the extent that an officer knows, or reasonably should know, that his or her question is likely to elicit an incriminating response, his or her later assertion that the question was asked for a seemingly innocuous purpose proffers nothing more than a *post hoc* rationalization for asking the question.

 This court has never expressly adopted the "routine booking question exception" as a matter of state constitutional law.[20] Nor do we perceive any need for this court to do so. The rationale behind the "routine

---

**20.** That there is such an "exception" to the *Miranda* warnings required as a matter of federal law is beyond dispute. *See, e.g., Muniz*, 496 U.S. at 600–02 & n. 14, 110 S.Ct. 2638 (Brennan, J., plurality opinion) (holding that questions

booking question exception" is that questions eliciting general biographical data necessary for purposes of booking and pretrial services are not, in the vast majority of cases, reasonably likely to elicit incriminating responses. *See, e.g., Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. 2638 (noting that "the police may not ask questions, even during booking, that are designed to elicit an incriminating response"); *id.* at 609, 110 S.Ct. 2638 (Marshall, J., concurring and dissenting) (opining that the routine booking question exception "should not extend to booking questions that the police should know are reasonably likely to elicit incriminating responses"); *United States v. Foster,* 227 F.3d 1096, 1103 (9th Cir.2000) (observing that, "generally[,] . . . inquiries regarding general biographical information [do not constitute] interrogation" because "[o]nly questions 'reasonably likely to elicit an incriminating response from the suspect' amount to interrogation" (citation omitted)); *United States v. Parra,* 2 F.3d 1058, 1068 (10th Cir.1993) ("[t]he underlying rationale for the exception is that routine booking questions do not constitute interro-

gation because they do not normally elicit incriminating responses" (citations omitted)); *Franks v. State,* 268 Ga. 238, 486 S.E.2d 594, 597 (1997) ("the rationale for creating an exemption to *Miranda* for questions asked during booking is that these questions are generally unrelated to the crime and are therefore unlikely to elicit an incriminating response"); *State v. Brann,* 736 A.2d 251, 255 (Me.1999) ("[a]dministrative questions, not likely to elicit an incriminating response, include those 'routine booking questions' normally attending arrest which seek only biographical data necessary to complete booking or pretrial services' " (citations and some internal quotation signals omitted)). Thus, to the extent that, under article I, section 10, the ultimate question regarding "interrogation" is whether the questioning officer knew or reasonably should have known that his or her question was likely to elicit an incriminating response, the fact that a question is in the nature of a "routine booking question" is merely one consideration among many relevant to an assessment of the totality of the circumstances.[21] In other words, the "rou-

---

regarding a defendant's name, address, height, weight, eye color, birth date, and current age constituted "custodial interrogation" but fell within the " 'routine booking question' exception which exempts from *Miranda* 's coverage questions to secure the biographical data necessary to complete booking or pretrial services," but observing that that the "exception" would not apply to questions posed during the booking process "that are designed to elicit incriminatory admissions" (citations and internal quotation signals omitted)); *id.* at 608–12 (Marshall, J., concurring in part and dissenting in part) (observing that, even if *Miranda* admits of a routine booking question exception, "it should not extend to booking questions that the police should know are reasonably likely to elicit incriminating responses" and disagreeing that the exception should extend only to those questions "designed" to elicit incriminating responses); *United States v. Bishop,* 66 F.3d 569, 572 n. 2 (3d Cir.1995) (recognizing the "routine booking question exception"); *Presley v. City of Benbrook,* 4 F.3d 405, 408 n. 2 (5th Cir.1993) (observing that, "[i]n the wake of *Muniz,* . . . a routine booking question exception to the Fifth Amendment exists" and citing, *inter alia,* cases from the United States Courts of Appeals for the Sixth, Seventh, and Ninth Circuits); *United States v. Horton,* 873 F.2d 180, 181 n. 2 (8th Cir.1989) (asserting that "[i]t is well established that *Miranda* does not apply to biographical data necessary to complete booking or pretrial services" and citing cases from the United States

Courts of Appeals for the First, Second, Fifth, Seventh, Eighth, and Eleventh Circuits); *United States v. Parra,* 2 F.3d 1058, 1068 (10th Cir. 1993) (recognizing routine booking question exception, observing that "[t]he underlying rationale for the exception is that routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses, and holding that 'where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of *Miranda* ' " (citations omitted)).

21. We expressly decline to adopt, as a broad "exception" to the required warnings, the rule that, if an officer expressly asks an arrestee for biographical data necessary for booking or pretrial services, the arrestee's response is not, as a *per se* matter, suppressible under article I, section 10 so long as the officer did not specifically intend—or, to use Justice Brennan's word, did not "design"—the question to elicit an incriminating response. *See Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. 2638. Rather, we agree with Justice Marshall that "[t]he far better course [is] to maintain the clarity of the doctrine by requiring police to preface all [interrogation] of a suspect with *Miranda* warnings *if they want his [or her] responses to be admissible at trial." Id.* at 610, 110 S.Ct. 2638 (Marshall, J., concurring and dissenting) (emphasis added). In addition to the unnecessary litigation that the "routine

tine booking question exception" does no more than recognize that not every "express question" constitutes "interrogation." *See, e.g., United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir.1981) ("[c]ertainly, not every question is an interrogation"); *Foster,* 227 F.3d at 1102 (same).

■ Accordingly, we reaffirm the principle that "interrogation" consists of any express question—or, absent an express question, any words or conduct—that the officer knows or reasonably should know is likely to elicit an incriminating response. *See, e.g., Ikaika,* 67 Haw. at 567, 698 P.2d at 284; *State v. Pauhana,* 66 Haw. 499, 503, 666 P.2d 592, 595 (1983). The totality of the

circumstances must be considered to determine whether "interrogation" has occurred, with a focus upon the officer's conduct, the nature of the question (including whether the question is a "routine booking question" [22]), and any other relevant circumstance.[23]

■ We pause, at this point, to address the prosecution's concern, which we share, that law enforcement officers must not be precluded from engaging in "legitimate" on-the-scene questioning that is "necessary to [a] criminal investigation." Indeed, we have in the past expressly recognized that the *Miranda* rule was never intended "to hamper law enforcement agencies in the exercise of their investigative duties or in the perfor-

booking question exception" would be likely to engender, *see id.* at 610, 110 S.Ct. 2638 (Marshall, J., concurring and dissenting), we believe that in focusing the inquiry upon whether an officer "designed" a question to elicit an incriminating response, the formulation of the rule in the lead opinion in *Muniz* misdirects the inquiry to the officer's subjective intent. *See id.* at 611 (Marshall, J., concurring and dissenting) ("[a]lthough the police's intent to obtain an incriminating response is relevant to this inquiry, the key components of the analysis are the nature of the questioning, the attendant circumstances, and the perceptions of the suspect" (citation omitted)); *see also State v. Roman,* 70 Haw. 351, 358, 772 P.2d 113, 117 (1989) ("regardless of their initial, actual, subjective intent, the police detectives should have realized that they were essentially asking [the defendant] to confess"); *Ikaika,* 67 Haw. at 570, 698 P.2d at 286 (Padgett, J., dissenting) (the question whether the police should know that a question is reasonably likely to elicit an incriminating response "focuses primarily upon the perceptions of the suspect, rather than the intent of the police" (quoting *Innis,* 446 U.S. at 300–01)); *State v. Jenkins,* 1 Haw.App. 430, 620 P.2d 263 (1980) (same).

**22.** If relevant, subsidiary considerations may include: (1) the nexus, if any, between the question asked and the booking process, on the one hand, and the alleged offense, on the other; (2) whether the question was asked at the scene of the arrest or in a traditional station house or other formal booking setting; (3) whether the officer who asked the question would ordinarily be involved in the formal booking process; and (4) whether the question was asked within a reasonable time after the person was arrested. *See, e.g., Foster,* 227 F.3d at 1103 ("it is relevant, but not determinative, that a question posed was not related to the crime or the suspect's participation in it"); *State v. Bryant,* 241 Wis.2d 554, 624 N.W.2d 865, 869 (Ct.App.2001) ("[t]o qualify for the exception, the questions must be asked by an agency ordinarily involved in booking suspects,

must be asked during a true booking[,] and must be asked shortly after the suspect has been taken into custody" (citing *United States v. Mata–Abundiz,* 717 F.2d 1277, 1280 (9th Cir.1983) (observing that, in applying the routine booking question exception, "the subjective intent of the agent is relevant but not conclusive" and *"[t]he relationship of the question asked to the crime suspected is highly relevant"* (emphasis added))).

**23.** The concurring and dissenting opinion disagrees that whether a particular question is in the nature of a routine booking question should be "absor[bed] into a 'totality of the circumstances' test." Concurring and dissenting opinion at 132, 34 P.3d at 1031. However, the very cases it relies upon reflect the necessity of assessing the totality of the circumstances. *See id.* at 131, 34 P.3d at 1030 (quoting *United States v. Avery,* 717 F.2d 1020, 1025 (6th Cir.1983) ("Even a relatively innocuous series of questions may, *in light of the factual circumstances and the susceptibility of a particular suspect,* be reasonably likely to elicit an incriminating response.") (Emphasis added to concurring and dissenting opinion's quotation.), and *United States v. Mata–Abundiz,* 717 F.2d 1277, 1280 (9th Cir.1983) ("If, however, the questions are reasonably likely to elicit an incriminating response *in a particular situation,* the exception does not apply.") (Emphasis added to concurring and dissenting opinion's quotation.)). Moreover, the concurring and dissenting opinion provides no rationale, or, indeed, authority, for why a "routine booking question exception" is necessary as a separately articulated exception to the interrogation prong of *Miranda* analysis in the first place. Insofar as the concurring and dissenting opinion agrees with us that the so-called "exception" does not apply if the officer posing the question reasonably should know that the question is likely to elicit an incriminating response, *see* concurring and dissenting opinion at 131–32, 34 P.3d at 1030–31, we fail to discern how this "exception"

mance of their traditional investigatory functions." *Patterson,* 59 Haw. at 361–62, 581 P.2d at 755; *see also Melemai,* 64 Haw. at 481–82, 643 P.2d at 544 ("[A]pplication of the *Miranda* rule ... does not preclude the police, in the exercise of their investigatory duties or functions, from making general on-the-scene inquires as to facts surrounding a crime or other general questions in the fact-finding process." (Citation omitted.)). However, application of the *Miranda* rule in any given case merely precludes the prosecution from adducing particular evidence (*e.g.,* Ketchum's residential address) through a specific source (*e.g.,* Ketchum's own words) in a subsequent criminal trial, and does not, in and of itself, impose constraints upon an officer conducting a legitimate on-the-scene investigation.

 On the facts of the present matter, by questioning the occupants of the residence to determine who was a visitor and who was not, we do not believe that the officers conducted their investigation in an illegitimate fashion. They certainly could make such inquires, up to the point of arrest, in order to legitimately establish whom to arrest.[24] *See, e.g., Ah Loo,* 94 Hawai'i at 210–11, 10 P.3d at 731–32; *State v. Wyatt,* 67 Haw. 293, 298–301 & n. 6, 687 P.2d 544, 549–550 & n. 6 (1984). But if an officer poses a question to someone who is "in custody," which the officer reasonably should know is likely to elicit an incriminating response (which response, in turn, the officer reasonably should know that the prosecution is likely to seek to adduce in a subsequent criminal proceeding for the purpose of inculpating the questioned individual), the officer must precede the question with the requisite

warnings and obtain a valid waiver of the questioned individual's related constitutional rights if the response is to be admissible at trial. On the other hand, the application of the *Miranda* rule to preclude the prosecution from utilizing the defendant's own words against him or her at trial does not, in and of itself, preclude the officer in the field from posing questions in the first instance for legitimate investigative purposes, such as ascertaining the defendant's identity and the place of abode where he or she can be found. In other words, the *Miranda* rule merely mandates that a defendant's responses, if given in a custodial context, to such on-the-scene investigative questions cannot be used *by the prosecution* in a subsequent *criminal trial* to inculpate the defendant and does not speak to whether the police may utilize and rely upon the defendant's responses for other legitimate investigative purposes.

### 2. *Custody*

 "To determine whether 'interrogation' is 'custodial,' we look to the totality of the circumstances, focusing on 'the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and [any] other relevant circumstances.' " *Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731 (quoting *Melemai,* 64 Haw. at 481, 643 P.2d at 544) (brackets in original). Again, the question to be answered, once it is determined that a defendant has been "interrogated" within the meaning of article I, section 10, is whether the defendant, at the time of the "interrogation," was "in[ ] custody or otherwise deprived of his [or her] freedom ... in any significant way[.]"[25] *Hoey,* 77 Hawai'i at 33, 881 P.2d at 520 (citations omitted).

---

exempts any particular question from constituting interrogation.

24. As will be seen, however, *see infra* section III.A.2 and III.B, the point of arrest had arrived, and Ketchum was, therefore, "in custody," before he was asked for his residential address.

25. As noted *supra* in note 19, the analysis contained in this section addresses the point at which it may be said that a person is "in custody" for purposes of triggering *Miranda* warnings and, in the main, is focused upon describing the circumstances that are sufficient to constitute a "significant" deprivation of a person's freedom of action (and, therefore, sufficient to render the person "in custody" for *Miranda* purposes), even

though the person has not been formally arrested. By locating these circumstances around the "point of arrest," be it formal or *de facto,* we do not limit the application of *Miranda* only to those situations in which a person has been formally arrested, as the concurring and dissenting opinion seems to claim. *See* concurring and dissenting opinion at 132–33, 34 P.3d at 1031–32. Rather, we are simply clarifying that if the totality of the circumstances reflects that a person's freedom of action has been deprived to a degree tantamount to that associated with arrest (regardless of whether an officer has formally arrested the person), the person's freedom of action has been "significantly" deprived and, thus, he or she is "in custody" for purposes of triggering *Miranda* warnings.

■ As we recently noted in *Ah Loo*, "no precise line can be drawn" delineating when "custodial interrogation," as opposed to non-custodial "on-the-scene" questioning (which is outside the protection against self-incrimination that article I, section 10 affords to an accused), has occurred. 94 Hawai'i at 210, 10 P.3d at 731 (citations, internal quotation signals, and original brackets omitted). Rather, the question whether a person has been significantly deprived of his or her freedom, such that he or she is "in custody" at the time he or she is "interrogated," must be addressed on a case-by-case basis "because each case must necessarily turn upon its own facts and circumstances." *Patterson*, 59 Haw. at 362, 581 P.2d at 756.

Nonetheless, we discern a point along the spectrum "beyond which on-the-scene [questioning]" becomes "custodial," such that article I, section 10 precludes the prosecution from adducing a defendant's resulting statement at trial unless the question has been preceded by the requisite *Miranda* warnings. *Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731; *Patterson*, 59 Haw. at 362, 581 P.2d at 755–56. On one side of that point is the situation in which a person subjected to lawful investigative detention, which is brief in duration and during which the officer poses questions that are designed to confirm or dispel the officer's reasonable suspicion that criminal activity is afoot, has not had his or her liberty infringed to such a significant degree as to render the detainee "in custody" for purposes of triggering the prosecution's burden—under article I, section 10 of the Hawai'i Constitution—of establishing that the requisite *Miranda* warnings were first properly administered as an evidentiary precondition to the admissibility of the detainee's responses to the officer's questions at trial. *See Ah Loo*, 94 Hawai'i at 212, 10 P.3d at 733; *State v. Hoffman*, 73 Haw. 41, 54, 828

P.2d 805, 813 (1992); *Patterson*, 59 Haw. at 362–63, 581 P.2d at 755–56.

■ As we reaffirmed in *Ah Loo*,[26] a person

> temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and [has] become sustained and coercive (footnote omitted).

*Hoffman*, 73 Haw. at 54, 828 P.2d at 813 (quoting *Melemai*, 64 Haw. at 482, 643 P.2d at 544); *Patterson*, 59 Haw. at 362–63, 581 P.2d at 755–56 (quoting *People v. Manis*, 268 Cal.App.2d 653, 669, 74 Cal. Rptr. 423 (1969)). In other words, "whether the investigation has focused on the suspect and whether the police have probable cause to arrest him [or her] prior to questioning" are relevant considerations in determining whether a person is "in custody." *Melemai*, 64 Haw. at 481, 643 P.2d at 544; *see also Patterson*, 59 Haw. at 361–63, 581 P.2d at 755–56.

94 Hawai'i at 210, 10 P.3d at 731. In essence, therefore, *Ah Loo* reiterates the basic principle that when an officer lawfully conducting an investigative detention lacks probable cause to arrest the detainee and—so long as his or her questions remain brief and casual and do not become sustained and coercive—has not impliedly accused the detainee of committing a crime, the officer has not significantly infringed upon the detainee's liberty, such that the detainee is "in custody" and has thus been transformed into an "accused" to whom the protection against self-incrimination attaches.

---

26. Ketchum urges a nonretroactive application of this court's holding in *Ah Loo*. Generally, "judicial decisions are assumed to apply retroactively[.]" *State v. Peralto*, 95 Hawai'i 1, 6, 18 P.3d 203, 208 (2001). If, however, a judicial decision announces a "new rule," then this court may, in its discretion, determine that the interests of fairness preclude retroactive application of the new rule. *See id.* at 6–8, 18 P.3d at 208–10. *Ah Loo* did not announce a "new" rule, but,

rather, merely clarified the existing proposition that a person temporarily and lawfully detained need not be given *Miranda* warnings until the moment of express or implied accusation has arrived. *See Ah Loo*, 94 Hawai'i at 212, 10 P.3d at 733; *Melemai*, 64 Haw. at 482, 643 P.2d at 544; *Patterson*, 59 Haw. at 362–63, 581 P.2d at 756. As such, there is no "new *Ah Loo* rule" to which to give retroactive application in the first instance.

But, under *Ah Loo,* once a detainee becomes expressly or impliedly accused of having committed a crime—because the totality of the circumstances reflects either that probable cause to arrest the detainee has developed or that the officer's questions have "become sustained and coercive," the officer's investigation having focused upon the detainee and the questions no longer being designed to dispel or confirm the officer's reasonable suspicion—, then *Miranda* warnings, as well as a valid waiver the detainee's related constitutional rights, are required before the fruit of further questioning can be introduced in a subsequent criminal proceeding against the detainee. *Id.* at 212, 10 P.3d at 733.

■■■ Accordingly, on the other side of the "point along the spectrum" stands the proposition, equally axiomatic, that a person whom an officer has formally and "physically" arrested[27] is "in custody" for purposes of article I, section 10. *See State v. Vallesteros,* 84 Hawai'i 295, 301, 933 P.2d 632, 638 (1997) ("arrest" involves, *inter alia,* "taking an alleged violator into extended physical custody"); *State v. Wyatt,* 67 Haw. 293, 301 n. 6, 687 P.2d 544, 550 n. 6 (1984) (observing that "[i]f the defendant had been arrested before being asked if she had been drinking, *Miranda* warnings were clearly in order"); *State v. Amorin,* 61 Haw. 356, 360, 604 P.2d 45, 48 (1979) (noting that "it is undisputed that after his arrest, the defendant was in the custody of [the police]" (citing, generally, *Patterson,* 59 Haw. 357, 581 P.2d 752)). *Cf. State v. Nakoa,* 72 Haw. 360, 366, 817 P.2d 1060, 1064 (1991) (holding, in the context of a prosecution for second degree escape, that, although defendant was not handcuffed, he had nonetheless been "placed under arrest, had had his liberty restrained in that he was not free to leave," and, "[a]t that point, the first step in the process of transporting him to the police station had begun[;]" consequently, the defendant's "arrest was complete and he was in custody"); *State v. Ryan,* 62 Haw. 99, 101, 612 P.2d 102, 103 (1980) (holding that "once the defendant has submitted to the control of the officer and the

process of taking him [or her] to the police station . . . has commenced, his [or her] arrest is complete and he [or she] is in 'custody,' for the purposes of the escape statute"). As this court acknowledged in *Wyatt,* "[i]t is well settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " 67 Haw. at 301 n. 6, 687 P.2d at 550 n. 6 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam*))). Simply said, even without sustained and coercive questioning, if the "point of arrest . . . has been reached," the prosecution must establish that *Miranda* warnings, as well as a valid waiver of the defendant's related constitutional rights, preceded any "interrogation" as a precondition to the admissibility at trial of any resulting statement made by the defendant. *See Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731 (citations omitted).

■■■ However, determining the precise point at which a temporary investigative detention has ripened into a warrantless arrest is no more susceptible to a bright-line rule than is determining when a suspect is "in custody." *See, e.g., United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (observing that there are "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest" and declining to adopt a "bright line" rule demarcating one from the other); *Washington v. Lambert,* 98 F.3d 1181, 1185 (9th Cir.1996) ("[t]here is no bright-line rule to determine when an investigatory stop becomes an arrest" (citing *United States v. Parr,* 843 F.2d 1228, 1231 (9th Cir.1988))); *see also Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731. Nevertheless, it is self-evident that a temporary investigative detention in the absence of sustained and coercive questioning is "noncustodial," whereas an arrest is "custodial." *See Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731. Accordingly, an arrestee is

---

27. We use the term "arrest" in this opinion to mean "physical" arrest. *Cf. State v. Vallesteros,* 84 Hawai'i 295, 301, 933 P.2d 632, 638 (1997) (holding "that an 'arrest' may involve either (1)

taking the alleged violator into extended physical custody or (2) issuing the individual a citation" and noting that, "when we use the word 'arrest' in this opinion, we refer to physical arrest").

obviously "in custody" whether or not, in retrospect, the arresting officer had probable cause to effect the arrest in the first place. *Cf. State v. Delmondo*, 54 Haw. 552, 557, 512 P.2d 551, 554 (1973) (observing that an officer's failure to state, "I place you under arrest," does not preclude an arrest from occurring where an officer's action makes it clear to the defendant that he or she is not free to leave and holding that an officer who had probable cause to arrest took custody of the defendant by ordering him to leave a toilet stall, stand up against a wall, and remain subject to his commands); *State v. Ortiz*, 4 Haw.App. 143, 662 P.2d 517 ("[a]n arrest occurs where the defendant clearly understands that he [or she] is not free to go and no 'magic words' such as, 'I place you under arrest,' are required" (citations omitted)), *affirmed*, 67 Haw. 181, 683 P.2d 822 (1984). So long as an objective assessment of the totality of the circumstances reflects that "the point of arrest" has arrived, the arrestee, at that point, is "in custody" for purposes of article I, section 10.

■ Although there is no simple or precise bright line delineating when "the point of arrest" has arrived, it is well settled that a temporary investigative detention must, of necessity, be truly "temporary and last no longer than is necessary to effectuate the purpose of the [detention]"—*i.e.*, transpire for no longer than necessary to confirm or dispel the officer's reasonable suspicion that criminal activity is afoot. *Sharpe*, 470 U.S. at 684, 105 S.Ct. 1568 (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)); *see also State v. Melear*, 63 Haw. 488, 493, 630 P.2d 619, 624 (1981) (observing that "[a] brief stop of a suspicious individual, in order to determine his [or her] identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at that time" (quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972))). In other words, a temporary investigative detention must "be reasonably related in scope to the circumstances which justified [the detention] in the first place," *State v. Silva*, 91 Hawai'i 80, 81, 979 P.2d 1106, 1107 (1999) (quoting *Sharpe*, 470 U.S. at 682, 105 S.Ct. 1568), and, thus, must be "no greater in intensity than absolutely necessary under the circumstances," *see Silva*, 91 Hawai'i at 81, 979 P.2d at 1107 (quoting *State v. Kaluna*, 55 Haw. 361, 369, 520 P.2d 51, 58–59 (1974)).

■ Moreover, while no single factor, in itself, is dispositive as to when a temporary investigative detention has morphed into an arrest, the potential attributes of "arrest" clearly include such circumstances as handcuffing, leading the detainee to a different location, subjecting him or her to booking procedures, ordering his or her compliance with an officer's directives, using force, or displaying a show of authority beyond that inherent in the mere presence of a police officer, as well as any other event or condition that betokens a significant deprivation of freedom, "such that [an] innocent person could reasonably have believed that he [or she] was not free to go and that he [or she] was being taken into custody indefinitely," *Kraus v. County of Pierce*, 793 F.2d 1105, 1109 (9th Cir.1986). *See also Delmondo*, 54 Haw. at 557, 512 P.2d at 554 (observing that officer "took custody of the defendant and his cohort by obliging them to leave the toilet stall, stand against a wall, and generally to remain subject to his directions" and holding that "[t]his type of action, despite the absence of the magic words ('I place you under arrest' etc.), is an arrest, where the defendant clearly understands that he [or she] is not free to go"); *State v. Crowder*, 1 Haw.App. 60, 64–65, 613 P.2d 909, 912–13 (1980) (holding that defendant "was arrested ... when the police officer took physical custody of him" by "grabbing his arm" and "returned him to the hotel for detention there"). *Cf. State v. Groves*, 65 Haw. 104, 649 P.2d 366 (1982) (holding that "no valid arrest had taken place before the search of the [defendant's] person was conducted," even though, prior to that point, a police officer had approached the defendant, displayed his badge, informed the defendant of his suspicions that the defendant's luggage contained drug contraband, informed the defendant of his constitutional rights, and detained the defendant for twenty minutes, after he had "accompanied the officers to" a police "office" located in the airport); *Patterson*, 59 Haw. at 363, 581 P.2d at 756 (holding that the defendant was not "in custody" and

observing that "[n]o guns were drawn and kept upon the defendant" and that "he [had not been] confronted and subjected to an overbearing show of force"). We agree with the United States Court of Appeals for the Ninth Circuit that, "when determining whether an arrest has occurred, a court must evaluate all the surrounding circumstances, 'including the extent to which liberty of movement is curtailed and the type of force or authority employed.' " *United States v. Torres–Sanchez,* 83 F.3d 1123, 1127 (9th Cir. 1996) (quoting *United States v. Robertson,* 833 F.2d 777, 780 (9th Cir.1987)).

█ In summary, we hold that a person is "in custody" for purposes of article I, section 10 of the Hawai'i Constitution if an objective assessment of the totality of the circumstances reflects either (1) that the person has become impliedly accused of committing a crime because the questions of the police have become sustained and coercive, such that they are no longer reasonably designed briefly to confirm or dispel their reasonable suspicion or (2) that the point of arrest has arrived because either (a) probable cause to arrest has developed or (b) the police have subjected the person to an unlawful *"de facto"* arrest without probable cause to do so.

We now turn to the prosecution's arguments in the present appeal.

### B. *Officer Masaki's Elicitation Of Ketchum's Address*

█ With respect to Officer Masaki's elicitation of Ketchum's address, the prosecution challenges the circuit court's COL Nos. 5 and 6, citing *Ah Loo* for the proposition that, notwithstanding that police officers had "briefly detained" Ketchum and, therefore, had "seized" him, he was, nevertheless, not "in custody" when Officer Masaki questioned him. Thus, the prosecution posits that *Mi-*

*randa* warnings were not foundational to the evidentiary admissibility of the substance of Ketchum's response to Officer Masaki's question regarding his address. In his answering brief, Ketchum concedes that, inasmuch as this court overruled *Blackshire* in *Ah Loo* to the extent that *Blackshire* had held that a person "seized" within the meaning of article I, section 7 of the Hawai'i Constitution was, as a *per se* matter, "in custody" for purposes of article I, section 10, the circuit court erred in relying upon *Blackshire.*[28] Nonetheless, Ketchum maintains that the totality of the circumstances reflect that Officer Masaki had subjected him to "custodial interrogation." We agree.

With respect to whether Officer Masaki's question constituted "interrogation," the record reflects that it was obviously not "reasonably designed to confirm or dispel—as briefly as possible and without any coercive connotation by either word or conduct—[a] reasonable suspicion that criminal activity was afoot." *Ah Loo,* 94 Hawai'i at 212, 10 P.3d at 733 (citation omitted). To the contrary, Officer Masaki admitted that he was aware that Ketchum's residential address was relevant to establishing whether Ketchum constructively possessed any drug contraband that might be found anywhere in the residence. Thus, Officer Masaki, of necessity, reasonably knew or should have known that asking Ketchum his address, having discovered him, early in the morning, in bed in the residence, was likely to yield an incriminating response. That being the case, Officer Masaki's testimonial assertion at the suppression hearing that he had posed the question merely to identify Ketchum as one of the people whom he had located and to include the information in his follow up report was simply a *post hoc* rationalization of his having elicited an incriminating admission by Ketchum of his residential address. Accordingly, we hold that

28. Although the circuit court's COLs do not cite *Blackshire,* in orally ruling upon Ketchum's motion to suppress, the circuit court, after briefly recessing to "reread *Blackshire* in light of [the Intermediate Court of Appeals' decision in *State v.] Ah Loo,*" 94 Hawai'i 201, 9 P.3d 513 (App.), *rev'd,* 94 Hawai'i 207, 10 P.3d 728 (2000), remarked in relevant part as follows:

... [T]he [c]ourt rules that the motion to suppress is granted. The police officers obvi-

ously were focused on Mr. Ketchum and they knew or reasonably should have known that the procedure, the booking procedure if you will, would result in incriminating statements. And, therefore, I believe they were obligated, under *Blackshire,* to comply with the formalities before questioning him and did not do so at the scene questioning regarding his domicile or residence.

Officer Masaki subjected Ketchum to "interrogation." *See supra* Section III.A.1.

The question whether Ketchum was, at the point Officer Masaki elicited his address, "in custody" is admittedly a difficult one. It cannot be said that Officer Masaki's questions were so sustained or coercive as, in and of themselves, impliedly to accuse Ketchum of committing a crime, nor does Ketchum argue that they were. Moreover, the record reflects that probable cause to arrest Ketchum had not yet developed, insofar as the drug contraband predicating the charges against Ketchum was apparently not discovered until well after Officer Masaki posed his questions. Nevertheless, the totality of the circumstances reflect that an innocent person in Ketchum's shoes could reasonably have believed that he or she was not free to go and was being taken into custody indefinitely; thus, the point of *"de facto"* arrest had arrived and, for purposes of article I, section 10 of the Hawaiʻi Constitution, Ketchum, therefore, was "in custody."

Given the layout and relatively compact size of the apartment, as well as the fact that the door accessing Bedroom 1 from the central living room stood open, *see supra* note 4, Ketchum could not but have been aware that numerous police officers had forcibly opened the front door, entered the apartment, and were in the process of "securing" the occupants of the apartment. It was in this context that Officer Masaki encountered Ketchum and Wright in Bedroom 1, announced his office and purpose, and ordered Ketchum and Wright to display their hands. In relatively rapid succession thereafter, Officer Masaki elicited from Ketchum his address and "turned [him] over" to the team of NVD officers while Officer Flores was serving Wright with the warrant to search the same bedroom, and another officer photographed both Ketchum and Wright where they had been discovered in Bedroom 1. Ketchum, along with all of the other occupants of the premises, was then escorted to the garage, subjected to "field booking" procedures, and, at some point, flex handcuffed. Both Detective Towne and Officer Kaya acknowledged in their testimony that, once in the garage, Ketchum was "under arrest," and, according to Officer Flores, Ketchum was "formally" arrested when drug contraband was located in Bedroom 1, an event that, as we have noted, apparently did not occur until after Ketchum had been escorted to the garage and subjected to the field booking procedures.

The circumstances surrounding Ketchum's questioning contrast sharply with those surrounding Ah Loo's, which transpired within the context of a lawful temporary investigative encounter by three patrol officers in a public place and accompanied by no greater exhibition of authority than that inherent in the officers' mere presence and no display of force whatsoever. *See Ah Loo,* 94 Hawaiʻi at 209, 10 P.3d at 730. Officer Masaki's questioning of Ketchum, considered in a vacuum, might seem as innocuous as the officers' inquiry of Ah Loo regarding his age. However, the totality of the circumstances—in particular, the forcible entry into the residence of numerous police officers, who were simultaneously locating and detaining any and all occupants discovered within the residence, and the fact that Officer Masaki's first act was to state his authority and order Ketchum and Wright to display their hands—reflects a show of force and authority far exceeding that which inhered in the officers' mere presence.

We believe, on the record before us, that the point of *"de facto"* arrest (albeit that the arrest was unsupported by probable cause) had arrived before Officer Masaki elicited Ketchum's residential address—and, therefore, that Ketchum was "in custody" for purposes of article I, section 10—for the simple reason that, given the totality of the circumstances described above, an "innocent person [in Ketchum's position] could [indeed, would] reasonably have believed that he [or she] was not free to go and that he [or she] was being taken into custody indefinitely," *Kraus,* 793 F.2d at 1109. We therefore hold that Officer Masaki subjected Ketchum to "custodial interrogation" for purposes of article I, section 10 of the Hawaiʻi Constitution. Inasmuch as that "custodial interrogation" was not preceded by the warnings prescribed by *Miranda* and *Santiago,* the prosecution failed to establish the foundation requisite to rendering Ketchum's response admissible at trial.

Accordingly, the circuit court's COL Nos. 5 and 6 were not wrong.

## C. *The Elicitation Of Ketchum's Address During The Field Booking Procedure*

The prosecution challenges the circuit court's COL No. 7, asserting that the address Ketchum provided to an officer who, under the supervision of Detective Towne, was filling out the "booking sheet" fell within the "routine booking question exception." In light of our discussion *supra* in section III. A.1, we construe the prosecution's argument to be that the officer did not "interrogate" Ketchum. The prosecution does not dispute that, at the time the officer elicited the information necessary to complete the booking sheet, Ketchum was "in custody" for purposes of article I, section 10; nor does the prosecution contend that the officer did not expressly question Ketchum regarding his address. Rather, the prosecution argues that "[t]he booking questions were necessary to the criminal investigation[ ]" and that they were "straight-forward, non-accusatory in nature, and legitimate." By contrast, Ketchum maintains that, inasmuch as the officer knew or should have known that the question was likely to elicit an incriminating response, the "routine booking question exception" does not apply.

As the prosecution asserts, obtaining Ketchum's residential address was crucial to determining whether there was probable cause to "formally" arrest Ketchum and, thus, was a reasonable component of the officers' investigation, insofar as, according to Detective Towne, whether any given occupant of the premises was a visitor partially informed the officers' decision whether to arrest that occupant. As we have indicated, however, the *Miranda* rule does not preclude police officers engaged in a drug raid of a residence from asking questions designed to determine whether an occupant is a visitor. So long as the point of arrest has not yet arrived, an officer is unfettered by article I, section 10 from asking such questions in the course of his or her investigation or relying upon an occupant's response to assess whether probable cause to arrest the occupant has developed. Nor does the *Miranda* rule preclude an officer from asking questions of an arrestee that are necessary for the sole purpose of

"booking" him or her. The point is that, if the "booking" officer knows or reasonably should know that a "routine booking question" is likely to elicit an incriminating response, he or she must administer the requisite warnings and obtain a valid waiver of the arrestee's relevant constitutional rights before posing the question if the prosecution, in a subsequent criminal prosecution of the arrestee, is to be permitted to adduce evidence of the arrestee's response without running afoul of article I, section 10 of the Hawai'i Constitution. Inasmuch as Ketchum was, in fact, under arrest and, therefore, "in custody" at the time he was subjected to the field booking procedures, we turn to the question whether the field booking officer "interrogated" him.

Although the officer asked Ketchum for the information necessary to complete the "booking sheet" shortly after Ketchum was arrested, the information was not gathered in a traditional station house or other formal booking station. The record is devoid of any evidence that the officer who obtained the information from Ketchum was ordinarily involved in booking defendants. And, most significantly, the officer reasonably should have known—inasmuch as (1) he or she is presumed to be aware of the concept of constructive possession, *see, e.g., State v. Roman,* 70 Haw. 351, 358, 772 P.2d 113, 117 (1989) ("[w]e do not condone any police ignorance about the law and the consequences of a custodial interrogation" (citing *State v. Uganiza,* 68 Haw. 28, 702 P.2d 1352 (1985))), (2) the search warrant authorized a search for drugs, (3) Ketchum was found within a bedroom, and (4) the officers conducted the raid early in the morning—that asking Ketchum for his address was likely to elicit an incriminating response, to wit, that he resided in the residence identified in the search warrant. That being the case, justifying the inquiry on the ground that it was an innocuous "routine booking question" is simply another *post hoc* rationalization of the police having compelled Ketchum to implicate himself in the alleged crimes.

We hold that the "booking" officer obtained Ketchum's admission regarding his address as a result of "custodial interroga-

tion." Insofar as the prosecution failed to adduce any evidence at the suppression hearing that Ketchum was first informed, *inter alia,* of his right against self-incrimination and that he waived that right, the circuit court correctly concluded that Ketchum's statement was inadmissible at trial. Accordingly, COL No. 7 was not wrong.

### D. *Detective Itomura's Elicitation Of Ketchum's Address*

■ With regard to Detective Itomura's request that Ketchum provide his address on the form indicating that he understood his relevant constitutional rights, the prosecution challenges the circuit court's COL Nos. 8 and 9 by arguing that Detective Itomura did not "interrogate" Ketchum because he did not "design [the question] to elicit incriminating information." [29]

Ketchum expressly indicated on the form that he did not wish to "tell" Detective Itomura "what happened," thereby expressly invoking his right to remain silent. Nonetheless, Detective Itomura requested that Ketchum, *inter alia,* write his address on the form. That the "request," according to Detective Itomura, "wasn't a question," is irrelevant, inasmuch as the request called for a response and, at the very least, was the "functional equivalent" of express questioning, *see, e.g., Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731 (quoting *Melemai,* 64 Haw. at 481 n. 3, 643 P.2d at 544 n. 3 (quoting *Innis,* 446 U.S. at 300–301, 100 S.Ct. 1682)); *State v. Pahio,* 58 Haw. 323, 568 P.2d 1200 (1977) ("[t]o determine whether the detective's statement was tantamount to a question, we must determine whether his statement asked for a response" (discussing and citing *Brewer v. Williams,* 430 U.S. 387, 392, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977))). Moreover, Detective Itomura testified that, at the time he requested that Ketchum provide his residential address, he was fully aware that Ketchum's address was relevant to prosecuting him, specifically with regard to establishing that he constructively possessed the drug contraband discovered by Detective Towne. That being the case, Detective Itomura "interrogated" Ketchum despite Ketchum's invocation of his right to remain silent. Because the record clearly reflects that Ketchum did not waive this right, the circuit court rightly concluded that the waiver form was inadmissible at trial for the purposes of establishing Ketchum's residential address. Accordingly, the circuit court's COL Nos. 8 and 9 were not wrong.

### IV. *CONCLUSION*

In light of the foregoing, we affirm the first circuit court's findings of fact, conclusions of law, and order granting Ketchum's motion to suppress.

Opinion of ACOBA, J., concurring in part and dissenting in part, with whom RAMIL, J., joins.

I concur in the result reached, but must disagree with the totality of circumstances formulation seemingly adopted in this case. The facts of this case call for a straightforward application of fundamental precepts established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and certain of its progeny. Basic *Miranda*-related propositions bear recounting (1) to demonstrate their applicability to this case, (2) to elucidate the perplexity that may result from reformulating them, and (3) to highlight the harm that would be caused by their misapplication.

### I.

*Miranda* extends the constitutional privilege against self-incrimination to out-of-court statements obtained from an individual during custodial interrogation. *See id.* at 461, 86 S.Ct. 1602 (holding that the privilege against self-incrimination protects individuals from "informal compulsion exerted by law-enforcement officers during in-custody questioning"). That decision defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602. Ha-

---

29. The prosecution does not contest that Ketchum was "in custody" when Detective Itomura requested that he write his address on the waiver form or that Ketchum invoked, and did not waive, his right to remain silent.

wai'i has adopted this definition of custodial interrogation. *See State v. Melemai,* 64 Haw. 479, 481, 643 P.2d 541, 543 (1982); *State v. Sugimoto,* 62 Haw. 259, 264–65, 614 P.2d 386, 391 (1980); *State v. Amorin,* 61 Haw. 356, 360, 604 P.2d 45, 48 (1979); *State v. Kalai,* 56 Haw. 366, 368, 537 P.2d 8, 11 (1975). Interrogation has been described as express questioning or its functional equivalent. *See Arizona v. Mauro,* 481 U.S. 520, 526–27, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). "Functional equivalent" means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). An incriminating response is "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. 1682 (emphasis in original). The response protected must be testimonial in nature. A testimonial response is a "communication [that], explicitly or implicitly, relate[s] a factual assertion or disclose[s] information[,]" *Pennsylvania v. Muniz,* 496 U.S. 582, 594, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (quoting *Doe v. United States,* 487 U.S. 201, 210, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988)), and includes "both verbal and nonverbal conduct[,]" *id.* at 595 n. 9, 110 S.Ct. 2638 (citations omitted).

Accordingly, in my view, the appropriate framework in which *Miranda* issues should be resolved is whether (1) *after* having been either (a) taken into custody or (b) deprived of freedom of action in a significant way by the police, *see* 384 U.S. at 444, 86 S.Ct. 1602, (2) the individual was subjected to (a) express questioning or conduct or action that (b) the police knew or should have known would lead to an incriminating response, *see Innis,* 446 U.S. at 300–02, 100 S.Ct. 1682,[1] that (3) is testimonial in nature, *see Muniz,* 496 U.S. at 600, 110 S.Ct. 2638. This framework rests on our long-held view that "the protections which the United States Supreme

Court enumerated in *Miranda* have an independent source in the Hawaii Constitution's privilege against self-incrimination," *State v. Santiago,* 53 Haw. 254, 266, 492 P.2d 657, 664 (1971), in article I, section 10 of the Hawai'i Constitution,[2] and that, in its application, we have "consistently provided criminal defendants with greater protection under Hawaii's version of the privilege against self-incrimination ... than is otherwise ensured by the federal courts under *Miranda* and its progeny," *State v. Valera,* 74 Haw. 424, 433, 848 P.2d 376, 380 (1993) (citations omitted). Also relevant to this case is the so-called "booking" exception to *Miranda.* However, this exception to the *Miranda* requirements does not apply if a booking question would elicit an incriminating response. *See Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. 2638 (stating that "the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions").

## II.

Proceeding from the foregoing framework, this case may be directly resolved.

### A.

The police executed a search warrant for drugs at a Fort Weaver Road residence. In this context, a search warrant for drugs would only issue on probable cause to believe drugs would be found on the premises at the time the warrant was executed. *See* Hawai'i Rules of Penal Procedure (HRPP) Rule 41(a); Hawai'i Revised Statutes (HRS) § 803–31 (Supp.2000); *State v. Scott,* 87 Hawai'i 80, 85, 951 P.2d 1243, 1248 (1998) (explaining that HRPP Rule 41 requires that search warrants be supported "by probable cause to believe that the person or property is on the premises" to be searched). The parties and the court do not contend otherwise.

According to Detective Robert Towne, during the execution of the warrant, none of the persons found on the premises were permit-

---

**1.** I agree that the ultimate interrogation issue is whether the police know or should know that any express questioning or the functional equivalent thereof would have elicited an incriminating response under the circumstances.

**2.** Article 1, section 10 of the Hawai'i Constitution states in pertinent part that no person "shall ... be compelled in any criminal case to be a witness against oneself."

ted to leave, and all were considered, in his words, "suspects," because the discovery of any illicit drugs on the premises would subject them to criminal liability for constructive possession of drugs. Officer Alan Masaki, who first "secured" Defendant–Appellee Burt T. Ketchum, did not permit him to leave and asked for Ketchum's address, which Ketchum confirmed was the residence searched. At this point, Ketchum obviously was deprived of his freedom in a significant way and had been subject to express questioning: Officer Masaki knew (or at that point should have known) that his question was likely to elicit an incriminating response, and Ketchum's disclosure of his address provided "information," and thus was testimonial in nature.

Detective Towne ordered an unnamed officer to conduct "field booking" of Ketchum at the premises, apparently a process in which Ketchum's address was obtained and recorded on a preprinted booking form. At the point where Ketchum was apparently again questioned about his address, he was handcuffed and plainly in custody. Detective Towne agreed that, at that point, Ketchum was in "custody." Ketchum's custody status for the purposes of *Miranda* did not change thereafter. Detective Towne conceded, and the field booking officer should have known, that express questioning concerning Ketchum's address would elicit an incriminating statement.

Officer Michael Kaya obtained the field booking sheet and transported Ketchum to the police station for formal booking because he was under "arrest." At the police station, Detective Renold Itomura, through the constitutional rights form, confirmed that Ketchum was in "custody." Detective Itomura gave Ketchum the *Miranda* warnings. Although Ketchum indicated he did not want to relate "what happened," the detective requested that Defendant write his address on the form. While this request was not an express question, it was the functional equiv-

alent of interrogation, that is, "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response[,]" *Innis*, 446 U.S. at 301, 100 S.Ct. 1682, and Defendant's response, although nonverbal, was of a testimonial character. Because Ketchum declined to comment further, interrogation (including its functional equivalent aspect) should have been terminated by Itomura. Itomura was aware of the incriminating nature of Ketchum's written responses.

### B.

Although Plaintiff–Appellant State of Hawai'i (the prosecution) contends that the address request fell within the "booking exception" to *Miranda*, *i.e.*, that such a request usually would not be considered interrogation, that exception does not apply if the officer knew or should have known the booking question would elicit an incriminating response.[3] As the Supreme Court said in *Muniz*,

> [a]s amicus United States explains, "recognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." Brief for United States as Amicus Curiae 13. *See, e.g.*, *United States v. Avery*, 717 F.2d 1020, 1024–1025 (6th Cir.1983); *United States v. Mata–Abundiz*, 717 F.2d 1277, 1280 (9th Cir.1983); *United States v. Glen–Archila*, 677 F.2d 809, 816, n. 18 (11th Cir.1982).

496 U.S. at 601 n. 14, 110 S.Ct. 2638; *see also Avery*, 717 F.2d at 1025 ("Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response."); *Mata–Abundiz*, 717 F.2d at 1280 ("[The] ex-

---

**3.** *Miranda* principles are not curbs on police investigations. They relate only to matters that the prosecution later seeks to introduce at trial, matters that may be provable through sources and by evidence other than communications compelled under inherently coercive circumstances. The police are forewarned as to when

such warnings are required, inasmuch as warnings are necessary only if the police know or should know that the response they seek will be incriminating. Thus, whether the police *choose* to give *Miranda* warnings in any situation is something only they can determine in light of their assessment of the case.

ception for routine booking procedures ... arises because background questions rarely elicit an incriminating response. If, however, the questions are reasonably likely to elicit an incriminating response in a particular situation, the exception does not apply."). Even in our jurisdiction, the booking question has been acknowledged as a generally accepted exception to *Miranda*. *See, e.g., Amorin,* 61 Haw. at 359 n. 4, 604 P.2d at 48 n. 4 ("Additional exceptions to the *Miranda* rule, not relevant here, have been recognized by courts in other jurisdictions. These exceptions include ... statements made in response to police questioning seeking basic booking information[.]" (Citations omitted.)). The booking exception is widely-accepted, long-established, and serves as a useful, shorthand analytical tool. With the established qualification on its scope set forth in *Muniz,* I see no reason for its absorption into a "totality of the circumstances" test.

Whereas the address booking question in this case was one that the police knew or should have known would elicit an incriminating response, the booking question exception would not apply. *See Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. 2638 ("[R]ecognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception.") Therefore, Ketchum having been (1) initially deprived of freedom of action in a significant way, (2) subsequently taken into custody, and (3) subjected to interrogation via express questions or a functional equivalent thereof which (4) the police knew or should have known would elicit an incriminating response, the (5) absence of constitutional warnings pertinent to self-incrimination (6) require that his verbal and nonverbal responses to the questions be suppressed. In conclusion, this case should be decided within the settled legal framework set forth above.

### III.

The deprivation of freedom of action aspect of *Miranda* was implicated, but not directly addressed, in *State v. Ah Loo,* 94 Hawai'i 207, 210, 212, 10 P.3d 728, 731, 733 (2000). In that case, this court determined that "seizure" and "custody" are "[not] synonymous" and the so-called investigative detention of Ah Loo was not "custodial" in the

*Miranda* sense. Although acknowledging that "two criteria" governed, *i.e.,* that "(1) the defendant must be under interrogation; and (2) the defendant must be in custody", the "dispositive issue" was framed as "whether 'interrogation' is 'custodial,' " a question to be determined by "look[ing] to the totality of the circumstances[.]" *Id.* at 210, 10 P.3d at 731. It was said then, that "an individual may very well be 'seized' ... as, 'given the totality of the circumstances, *a reasonable person would have believed that he or she was not free to leave[ ]' and yet not be 'in custody' such that Miranda warnings are required* [.]" *Id.* at 211, 10 P.3d at 732 (citation omitted) (emphasis added).

While I joined in *Ah Loo* because a seizure does not necessarily mean a person is "in custody," *Miranda* is not limited to instances where a person "is taken into custody" as recited *supra,* but also extends to instances in which "*a person ... has been ... otherwise deprived of his [or her] freedom of action in any significant way.*" 384 U.S. at 444, 86 S.Ct. 1602. "Taking a person into custody," then, may be distinguished from "depriv[ation] of freedom of action in any significant way," and as its text suggests, the latter describes restraint that is of a lesser qualitative degree than that involved in "taking [someone] into custody." *Id.* Accordingly, the coercive environment identified in *Miranda* is present not only when a person is taken into custody, but also in the deprivation of freedom described in *Miranda* that is short of physically taking an individual into custody.

A purported "seizure" then that deprives a person of his or her freedom of action in any significant way satisfies the first *Miranda* precondition in the same way as taking a person into custody. *See United States v. Salvo,* 133 F.3d 943, 949 (6th Cir.1998) ("[T]he very cursory and limited nature of a *Terry [v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) investigative detention] stop, [in which] a suspect ... is not entitled to full custody *Miranda* rights ... does not equate to ... detentions of a more lengthy, substantive nature."). In that regard, the terms "seizure," "investigative encounter," and "investigative detentions" do not substantially advance analysis under *Miranda.*

They are essentially conclusions embodying the belief that the person concerned was not in custody or deprived of freedom of action in a significant way.

## IV.

Thus, in applying the principles embodied in *Miranda*, we have examined whether the defendant was deprived of his or her freedom of action in any significant way. In *State v. Russo*, 67 Haw. 126, 681 P.2d 553 (1984), this court decided that police should have advised the defendant of his *Miranda* rights. *See id.* at 134–35, 681 P.2d at 560. The police had determined that Russo was associated with a car seen at the scene of a shooting. *See id.* The defendant had allowed the police who were investigating the incident to enter his apartment. *See id.* It was held that Russo's "freedom of action definitely was restricted" despite the fact that he "was in a familiar environment of his own habitat" and that "an arrest is hardly a 'condition precedent' to custodial interrogation." *Id.* at 133, 136, 681 P.2d at 560, 561. This court reasoned that "[s]ince Russo could not have had a reasonable belief that he was 'free to go,' [it could] only conclude he had then been 'deprived of his freedom of action in ... [a] significant way.' " *Id.* at 136, 681 P.2d at 561 (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). Russo's statement was ordered suppressed because the police failed to read him his *Miranda* warnings "when they learned from [him] that he had purchased a .38 caliber revolver and that it was in the [suspect] vehicle." *Id.* at 136 n. 7, 681 P.2d at 561 n. 7.

Similarly, in the instant case, it cannot be reasonably disputed that from the moment the police entered Ketchum's bedroom and told him he could not leave, Ketchum could not have had a reasonable belief that he was "free to go" and, thus, was deprived of his freedom of action in a significant way. Because the deprivation of freedom standard gives lucid and comprehensible guidance to individuals, the police, counsel, and our trial courts, there is nothing to be gained, in applying *Miranda* principles, from absorbing it into a unified "custody" test that eliminates the distinction between being taken into custody and being deprived of freedom of action in any significant way.

Hence, I do not agree that the question of whether Ketchum was "taken into custody" by Officer Masaki "is admittedly a difficult one." Majority opinion at 127, 34 P.3d at 1026. Rather, that Ketchum had been significantly deprived of his freedom of action by Officer Masaki would appear self-evident, for, coupled with Masaki's actions, the police expressly confirmed that all persons present on the premises at the time of the search warrant's execution were not free to leave and were suspects in the crime of drug possession. Thus, resort to a totality of circumstances test beyond this point is unnecessary and only invites confusion, not clarity, in applying *Miranda*.

## V.

Although in any particular case, the circumstances as they relate to a particular aspect of the *Miranda* rule may be relevant, in the sense that the factual context must be consulted to resolve any ambiguity as to whether a coercive setting exists, a formulaic totality of the circumstances approach is not called for in every case, and, therefore, should not be incorporated into a governing test. Thus, a totality of circumstances approach that involves *inter alia* whether (1) the police "questions were so sustained or coercive [4] as, in and of themselves, [to] impli-

---

4. The seminal Hawai'i case that suggests that a person faces custodial interrogation when "the questioning has ceased to be brief and casual and becomes sustained and coercive" is *State v. Patterson*, 59 Haw. 357, 363, 581 P.2d 752, 756 (1978). *Patterson* divined this standard from *People v. Manis*, 268 Cal.App.2d 653, 74 Cal. Rptr. 423 (1969). The *Manis* court held that persons temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive. *Id.* at 433. The *Manis* decision relied on *Miranda* to reach this conclusion and also referred in a footnote to a New York statute and the Uniform Arrest Act that explained that police may ask a suspect for general information such as his or her name, address, and "an explanation of his [or her] actions." *Id.* at 433 n. 5. However, *Miranda* nowhere premises the alternative coercive settings it posits on sustained and coercive questioning.

edly ... accuse Ketchum," majority opinion at 127, 34 P.3d at 1026 (plainly, that was not the case here); (2) "probable cause" was present (the point in time at which this was reached is not established) [5] (3) there was a "show of force and authority far exceeding that which inhered in the officers' mere presence," majority opinion at 127, 34 P.3d at 1026 (the conduct of police was not claimed to be disproportionate to the execution of a search warrant); and (4) the situation had reached "the point of ... arrest," majority opinion at 127, 34 P.3d at 1026 (the deprivation of freedom of action in a significant way preceded this), is extraneous to this case. The conclusion reached from the foregoing that custodial interrogation took place, majority opinion at 126, 34 P.3d at 1025, because, "given the totality of the circumstances ..., an 'innocent person [in Ketchum's position] could [indeed, would] reasonably have believed that he [or she] was not free to go and that he [or she] was being taken into custody[,]" majority opinion at 127, 34 P.3d at 1026 (quoting *Kraus v. County of Pierce*, 793 F.2d 1105, 1109 (9th Cir. 1986)) (brackets in original), takes us no further in analytical span than the pronouncement in *Miranda* that its warnings apply if a person has been deprived of freedom in a significant way. I fear that the path chosen leads into a totality of circumstances thicket in which our discussion and analysis will cause confusion, but worse, in which the defined guidelines of *Miranda* will be lost.

### VI.

As the Supreme Court has indicated, the *Miranda* doctrine was intended "to give concrete constitutional guidelines for law enforcement agencies and courts to follow." 384 U.S. at 441–42, 86 S.Ct. 1602. *Cf. Muniz*, 496 U.S. at 610, 110 S.Ct. 2638 ("The far better course would be to maintain the clarity of the doctrine by requiring police to preface all direct questioning of a suspect with *Miranda* warnings if they want his [or her] response to be admissible at trial." (Marshall, J., concurring in part and dissenting in part)). With all due respect, I find no help, and, in my view, individuals, the police,

counsel, and the trial courts would not be aided by the substitution of a multi-headed test for "custody" dependent upon (1) the "questions of the police" (thus melding the independent precondition of interrogation in *Miranda* into the custody requirement) or (2) whether "the point of arrest" has arrived, majority opinion at 125, 34 P.3d at 1024, in place of the plain and understandable direction of *Miranda* that the warnings are triggered in its custody aspect when the individual is taken into custody or that person's freedom of action has been deprived to a significant extent.

### VII.

Moreover, in its formulation, the holding in the instant case adopts a "custody" test that imposes significant limitations on the protections afforded by *Miranda*. *See* majority opinion at 126, 34 P.3d at 1025. As to its first prong, an "implied[ ] accus[ation]" because of "sustained and coercive" questioning,[6] majority opinion at 126, 34 P.3d at 1025, is nowhere set forth in *Miranda* as a basis for inferring custody, and, like the second prong, adds not only a further layer of inquiry to a doctrine intended to simplify the administration of police-obtained statements,[7] but elevates the showing necessary for *Miranda* warnings to be given. *See Miranda*, 384 U.S. at 441, 86 S.Ct. 1602 ("We granted certiorari in these cases ... in order to ... give concrete constitutional guidelines for law enforcement agencies and courts to follow.").

Nor is the second prong of "point of arrest" explicative of the *Miranda* preconditions for establishing a coercive setting. As to the subcategories of this prong, "probable cause to arrest" may exist in certain situations, but it is not a *Miranda* precondition and in reality raises the threshold for mandatory warnings, inasmuch as being taken into custody or deprived of freedom of action would otherwise suffice to invoke *Miranda*. As to the second subcategory, the presence of an unlawful "de facto" arrest begs the question; if the circumstances are sufficient

---

5. While probable cause was required to support the search warrant, probable cause to arrest Ketchum would constitute a separate matter.

6. *See also supra* note 1.

7. Of course, insofar as questioning is relevant in the *Miranda* context, even a single question suffices to invoke the *Miranda* strictures if the officer knew or should have known that an incriminating statement would be elicited, *see Innis*, 446 U.S. at 301, 100 S.Ct. 1682, as we hold here.

to establish what is in fact an arrest, then the individual has either been "taken into custody" or otherwise deprived of freedom of action in a significant way under the existing *Miranda* precepts.

## VIII.

For the foregoing reasons, I concur in the result in this case but not in the methodology by which it is reached or in the test that ostensibly emerges.